# INLAND WATERWAYS CORPORATION
## et al. v. HARDEE.[*]
### No. 7056.

United States Court of Appeals for the
District of Columbia.

Decided Oct. 31, 1938.

[*]Writ of certiorari granted 59 S.Ct. 589, 83 L.Ed. ——.

Leslie C. Garnett, Sp. Asst. to Atty. Gen., and David A. Pine, U. S. Atty., H. L. Underwood, Asst. U. S. Atty., and F. R. Conway, all of Washington, D. C., for appellants.

George B. Springston, Swagar Sherley, Charles F. Wilson, Henry B. Weaver, and George P. Barse, all of Washington, D. C., for appellee.

Before GRONER, C. J., and MILLER and VINSON, JJ.

GRONER, C. J.

This is a suit brought by the receiver of the insolvent Commercial National Bank of Washington City in behalf of its depositors, creditors, and stockholders against Inland Waterways Corporation, United States Shipping Board Merchant Fleet Corporation, Secretary of War Woodring, and H. A. A. Smith, Purchasing Officer of the Panama Canal. The purpose of the bill is to recover what are claimed to have been preferential payments made by the bank to defendants.

In the case of Fleet Corporation, which we shall dispose of first, the bill alleges that the Corporation deposited various sums of money with the bank; that the bank unlawfully pledged part of its assets (United States Bonds) to the Corporation to secure the deposits; that the bank thereafter became insolvent; and that the receiver appointed to administer its assets, erroneously, and acting under mistake of law, acquiesced in the sale by the Corporation of some of the bonds and redeemed the remainder from the Corporation by paying the market value thereof. The prayer of

the bill is that the Corporation be declared trustee for the benefit of the receiver of the sums paid to it and the sums realized by it from the sale and that the receiver have a decree for the amount thereof with interest.

No question is raised as to the form of the proceedings.

The Fleet Corporation answered, admitting the material facts and defending on the ground that the pledge was in all respects valid and lawful. The receiver made motions to strike certain parts of the answer and to enter a decree pro confesso. The trial court sustained the motions and decreed for the amounts claimed, subject to dividends of approximately 60% declared and paid to other creditors. This appeal followed.

Some, and perhaps the most important, of the questions argued here by counsel for the Corporation, were decided by us in O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.2d 146. That appeal involved the same facts as this and arose under the following circumstances: In August 1934 Thomas E. Rhodes, a depositor in the bank, instituted in the District Court a proceeding against the bank, Baldwin, then receiver, O'Connor, Comptroller, Fleet Corporation, Alien Property Custodian, and others, alleging, inter alia, substantially the facts we have outlined above and praying for restoration of the funds upon the ground that the payments had been preferentially made to the Corporation. The Comptroller and receiver moved to dismiss on the ground that the right to sue in this respect belonged primarily to the receiver and that the plaintiff had no capacity to maintain the suit in the absence of a showing that the receiver had refused to sue. The Corporation and the Custodian moved to dismiss on the same ground, but also on the ground that the Comptroller had authority to exact the pledges and that the bank had authority to make them. We held, for reasons stated in the opinion, that the suit by Rhodes was maintainable and that the bank was without power to pledge its assets to secure the deposits of the Corporation or the Custodian. On motion for reargument it was shown that the receiver, at the direction of the Comptroller, had reversed his previous attitude as to the validity of the pledge and had himself brought a suit in all respects similar to the Rhodes suit. In these circumstances we modified our opinion to the extent of holding that the

lower court might in its discretion stay the Rhodes suit and permit the receiver to prosecute his suit.

The Comptroller and receiver, as well as the Corporation and Custodian, applied to the Supreme Court for certiorari. The petition of the Comptroller and receiver was granted, limited to the question of the right of the depositor, Rhodes, to bring the suit. In view of our disposition of the motion for reargument, which did not foreclose action by the receiver, the Supreme Court affirmed without expressing an opinion on the merits of the case. 297 U. S. 383, 56 S.Ct. 517, 80 L.Ed. 733.

Thereafter the trial court entered a stay order in the Rhodes Case, and the present suit was brought to its conclusion in the trial court.

An understanding of the grounds which the Corporation argues on this appeal requires knowledge of the status of the Corporation, which at the time in question was as follows: By the Shipping Act of 1916, 46 U.S.C.A. § 801, et seq., Congress established the United States Shipping Board and gave it the power (Sec. 810) to create a corporation under the District of Columbia laws for the purchase, construction, and operation of merchant vessels in the commerce of the United States. The Board created the Corporation, capitalized at 50 million dollars, and the United States purchased all the stock. Thereafter the Corporation operated in the same manner as a private corporation created for similar purposes would have operated. It could be sued in the State or Federal courts as other corporations. Skinner & Eddy Corp. v. McCarl, 275 U.S. 1, 48 S.Ct. 12, 72 L.Ed. 131. Its employees were not agents of the United States subject to the provisions of Section 41 of the Criminal Code, 18 U. S.C.A. § 93. United States v. Strang, 254 U.S. 491, 41 S.Ct. 165, 65 L.Ed. 368. It was suable for its torts, Panama Railroad v. Curran, 5 Cir., 256 F. 768, and was liable for breach of contract. Skinner & Eddy Corp. v. McCarl, supra. In the latter case the Supreme Court, in describing its activities, said that one of the reasons for its incorporation was to enable it to conduct its operations with the freedom supposed to be inconsistent with accountability to the Treasury under its established procedure of audit and control over the financial transactions of the United States. And in Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet

Corporation, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762, the Supreme Court said that the fact that it was formed under the laws of the District of Columbia was persuasive that it was expected to contract and to stand suit in its own person. The activities of the Corporation were changed by the Act of 1920 known as the Merchant Marine Act, 46 U.S.C.A. § 861, et seq. By that Act Congress authorized the Shipping Board to take over the property held by the Corporation in its own name. This was accomplished by a deed of April 16, 1923. After that date the Corporation was utilized by the Shipping Board as an operating agent to complete projects begun by the Board and to liquidate certain other phases of the Board's activities. In February 1927 (44 Stat. 1083, 46 U.S.C.A. § 810a) Congress changed the name of the Corporation to United States Shipping Board Merchant Fleet Corporation, but made no change in its status.

The deposits which the Corporation made and which the bank secured by pledge of its assets represented: First, funds received by the Fleet Corporation in the ordinary course of its business, the disbursement of which was in the control of the proper officers of the Corporation for corporate purposes. Second, as agent for the Board the Corporation would offer for sale vessels which the United States owned and would receive bids from prospective purchasers. The bidders would be required to pay in advance a certain sum as earnest money. This the Corporation would deposit in an account designated—United States Shipping Board Merchant Fleet Corporation, Agent, Good Faith Deposit Account. When the sale was consummated, the unsuccessful bidders would receive back their earnest payments. The money paid by the successful bidder presumably would go into the regular Corporation agency account, designated—U. S. S. B. M. F. Corp., Agent, Deposit Acc't. It was these accounts which the bank secured by a pledge of its assets, and the question for decision is whether under the facts we have outlined the receiver is entitled to a judgment against the Corporation for the amount of the preference it received (less, of course, an amount proportionate to the dividends which had been paid to other depositors).

On this appeal the Corporation argues four points:

1st, that the deposits were of public money and since the pledge was in substantial conformity to R.S. § 5153, 12 U.S.C.A. § 90, it was valid;

2d, that if the pledge was invalid the deposits, being public money, were received by the bank in violation of R.S. § 5497, 18 U.S.C.A. § 182, as the result of which the bank became trustee ex maleficio thereof;

3d, that no recovery can be had against the Corporation because the proceeds of the pledged securities have been deposited in the United States Treasury; and

4th, that the trial court was without jurisdiction because the suit in substance is a suit against the United States.

We shall dispose of these arguments in order.

First. In the circumstances we have narrated we think it clearly appears that the two deposit accounts which stood in the name of the Corporation as agent contained money of the United States. That portion derived from the sale of vessels owned by the United States was obviously the Government's money. The earnest money collected from bidders did not, of course, belong to the United States. The greater part of it was destined to be returned to those whose bids were rejected. But even as to it we think that the custody of the agent was in a sense the custody of the United States. Our opinion in Richmond, F. & P. R. Co. v. McCarl, 61 App. D.C. 290, 62 F.2d 203, seems to us controlling in this respect.

But the contention of the Corporation does not prevail simply because the money which it received and deposited as agent of the Shipping Board was money of the United States. The question is whether it was the "public moneys" of the United States of the kind Congress had reference to in the statute upon which the Corporation relies in this case. That statute, R. S. § 5153, 12 U.S.C.A. § 90, authorizes the Secretary of the Treasury to designate a national bank as a depositary of public money and to require such bank to give satisfactory security for its safekeeping and prompt payment. The opinions of the Supreme Court in Texas & Pacific Ry. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L. Ed. 777, and Marion v. Sneeden, 291 U. S. 262, 54 S.Ct. 421, 78 L.Ed. 787, establish definitely two propositions, which in our

view are conclusive on this point. The first is that a national bank has no authority to pledge its assets to secure deposits otherwise than as Congress has expressly provided. The second is that R.S. § 5153 has limited application to deposits made by the Secretary of the Treasury and cannot be extended to cover all public funds of every sort which may be deposited in a national bank by someone who holds the funds on behalf of the United States.

The Corporation in this case was not the agent of the Secretary of the Treasury. The deposits made were not made by the Secretary, and the Secretary had no control of these funds until they were covered into the Treasury. For these reasons we adhere to our decision in O'Connor v. Rhodes, supra. There we said that there is nothing in R.S. § 5153 to authorize the taking of a pledge by the Corporation acting independently of the Secretary of the Treasury; that there was nothing to show that the deposits were made by direction of the Secretary but everything to the contrary; that there was nothing to show that the depositary bank was designated by the Secretary, but on the contrary that it was definitely proved that the pledge was taken by the Fleet Corporation on its own account.

Since it is not suggested, nor can be, that any other statute supports what was done in this case, we conclude that the pledge of assets by the bank was illegal and void. In this view it is unnecessary to consider those cases holding that, where a pledge is authorized by a statute, substantial compliance with the terms of the statute is sufficient.

Second. What we have said above largely disposes of the contention that if the pledge was invalid the deposits, being of public money, were received by the bank in violation of R.S. § 5497, 18 U.S.C.A. § 182,[1] as the result of which the bank became trustee ex maleficio. The statute makes it a criminal offense for any bank not an authorized depositary of public moneys to receive knowingly from any disbursing officer or collector of internal revenue or other agent of the United States any public money on deposit. We think it clear that the purpose of Congress in the enactment of this statute was to make sure that officers of the United States who received their moneys should not deposit them in any other place than a designated Government depositary from which the United States had exacted security. That statute would apply here if it was unlawful for the Corporation to deposit funds collected by it in any other depositary than a bank designated by the Secretary of the Treasury, but it is perfectly clear that there was no restriction, express or implied, upon the power of the Corporation to deposit funds which came into its possession in any depositary which it might select. This seems to us implicit in the language of the Supreme Court in the Skinner & Eddy Case, 48 S.Ct. 14, as follows:

"At no time, during the War or since its close, have the financial transactions of the Fleet Corporation passed through the hands of the general accounting officers of the government or been passed upon, as accounts of the United States, either by the Comptroller of the Treasury or the Comptroller General. The accounts of the Fleet Corporation, like those of each of the other corporations named, and like those of the Director General of Railroads during federal control, have been audited, and the control over their financial transactions has been exercised, in accordance with commercial practice, by the board or the officer charged with the responsibilities of administration. Indeed, an important if not the chief, reason for employing these incorporated agencies was to enable them to employ commercial methods and to conduct their operations with a freedom supposed to be inconsistent with accountability

[1] "Every banker, broker, or other person not an authorized depositary of public moneys, who shall knowingly receive from any disbursing officer, or collector of internal revenue, or other agent of the United States, any public money on deposit, or by way of loan or accommodation, with or without interest, or otherwise than in payment of a debt against the United States, or shall use, transfer, convert, appropriate, or apply any portion of the public money for any purpose not prescribed by law; and every president, cashier, teller, director, or other officer of any bank or banking association who shall violate any provision of this section is guilty of embezzlement of the public money so deposited, loaned, transferred, used, converted, appropriated, or applied, and shall be fined not more than the amount embezzled, or imprisoned not more than ten years, or both. (R.S. § 5497; Mar. 4, 1909, c. 321, § 96, 35 Stat. 1106.) "

to the treasury under its established procedure of audit and control over the financial transactions of the United States.

"* * * * * *

"For the Fleet Corporation is an entity distinct from the United States and from any of its departments or boards; and the audit and control of its financial transactions is, under the general rules of law and the administrative practice, committed to its own corporate officers, except so far as control may be exerted by the Shipping Board. * * *"

Since its creation, and even after it was divested of title to assets formerly held by it, the Corporation has exercised this control of its financial affairs free from the supervision and control of the Secretary of the Treasury. From its creation to the present time it has, with the knowledge and consent of Congress and of the Executive Departments of Government, conducted its financial affairs in all respects as a private corporation. Its bank deposits have never been considered subject to the rules and regulations applicable to deposits of public money, and this is illustrated in the regulations of the Reserve Board effective October 31, 1930, providing that the term "Government Deposit" shall not apply to deposits of the Fleet Corporation. Under these circumstances we think the accounts involved in this case must be treated just as the accounts of any other depositor would be treated.

Counsel for the Corporation rely upon cases like Allen v. United States, 1 Cir., 285 F. 678. There a postal official had deposited postal funds in a Massachusetts bank, and the bank had failed. The Court of Appeals held that the United States could recover the amount of the deposit from the bank as trustee ex maleficio. The theory was that, since the postal funds were public money, the postmaster had no authority to make the deposit and that the bank was prohibited by law from receiving it. The distinction between that case and this is clear. In the Allen Case the postmaster had no statutory authority to deposit postal money in the particular bank because there was a Government treasurer in Boston designated to receive the money (39 U.S.C.A. § 47), and he likewise had no authority because the bank was not an authorized depositary. 39 U.S.C.A. § 46; and see 31 U.S.C.A. § 521. In these circumstances the bank, in receiving the funds, took them in violation of that statute on which the Corporation relies in this branch of the case. 18 U.S.C.A. § 182. The Allen Case, therefore, presented the situation of a bank's receiving a deposit which it was prohibited by law from receiving from a person prohibited by law from making it. No such situation is present here. There was no provision, either in law or custom, against the Corporation's depositing in any bank it chose the funds which came into its possession; and there was equally no prohibition against the bank's receiving such deposit any more than in the case of the deposit of a private corporation. It is true the Corporation designated its accounts as agent accounts and presumably the bank knew it was receiving money of the United States for deposit, but we think that the deposits of public money which a bank is prohibited from receiving under 18 U.S. C.A. § 182 are the same and only the same as those which the bank would be authorized to secure by pledge of its assets under 12 U.S.C.A. § 90. The deposits of the Corporation, as we have seen, violated no Federal statute. In this view the bank cannot be held to any liability as trustee ex maleficio for the deposits it received.

 Third. The answer of the Corporation shows that after it received the proceeds of the pledged securities it covered the money thus realized into the Treasury and is now without power or right to restore it. It insists that this bars a right of recovery against it. But we think the fact that the Corporation has transferred the fund to the United States does not relieve the Corporation of liability. As the Supreme Court said in Sloan Shipyards Corp. v. United States Fleet Corporation, supra, 42 S.Ct. 389, "The transfer of the property of the Fleet Corporation to the Shipping Board by the Act of June 5, 1920, c. 250, § 4, 41 Stat. 988, 990, [46 U.S.C.A. § 863], may affect the value of the remedy afforded by the present suit but not the jurisdiction of the Court." In other words, a plaintiff may have a judgment notwithstanding the defendant is execution proof.

The question, as we think, does not depend upon the ability of the receiver to trace the funds which the Corporation received from the assets of the bank, but is controlled by the rule that one who participates in a breach of trust may be required either to account for the proceeds or respond in damages. Bank of Giles County

v. Fidelity & Deposit Co., 4 Cir., 84 F.2d 321. In this case the Corporation deposited funds under its control in a national bank and received from the bank security for the safe return thereof. The pledge was unlawful, and it is of no moment that the bank may have been solvent when the pledge was given, for the pledge became effective only upon insolvency and at that instant became substantially a preferential transfer prohibited by R.S. § 5242, 12 U. S.C.A. § 91.

When the Corporation demanded and received and used the pledged security and refused to return it after the bank's insolvency, a conversion of trust property ensued. Farmers' & Merchants' State Bank v. Con. School District, 174 Minn. 286, 219 N.W. 163, 65 A.L.R. 1407. There the bank pledged commercial paper with the treasurer of a school district to secure a deposit of school funds, and upon the insolvency of the bank the Commissioner of Banking demanded return of the paper. The Minnesota Court held—just as the Supreme Court held in the Pottorff Case —that the absence of statutory authority to pledge assets to secure deposits deprived the bank of any power to do the act; and the court thought the pledge was not only ultra vires and invalid but substantially a fraud upon other depositors whose right it was to share ratably in the assets of the bank upon liquidation; and that, because the refusal to return the pledge was a conversion, the Commissioner of Banks was entitled to maintain an action of trover.

And so we are of opinion that the pledge in question here was a preferential conversion of the bank's assets, and we think the receiver may maintain a suit to recover the pledged securities or, where they have been transferred, is entitled to a decree for their value; and in this respect we think it is no defense to the wrongdoer to say that the securities were sold and the proceeds turned over to the United States. An agent is not excused from liability for his torts because he acted only as agent, whoever his principal may be. The Corporation knew of the insolvency of the bank when under the terms of its pledge it converted the security to its own use, and it cannot escape liability by saying that it acted in this instance for principals who happen to be the United States. While the law is that an agent who receives money on behalf of his prin-

cipal, to which his principal is not entitled, is not liable where without knowledge of the mistake he pays the money to his principal, the rule has no application here for the reason that the Corporation was charged with knowledge of the invalidity of the pledge when it received and converted it. At best the position of the Corporation is that it paid over the money on the mistaken assumption of law that the United States were entitled to it. But that is not enough. When an agent does some act which his principal did not or could not authorize, he acts on his own responsibility. No valid authority could have been given the Corporation to exact an illegal pledge; since it did exact such a pledge, it is answerable for its tort without regard to the status of its principals. 1 Mechem on Agency, Sec. 1456; Hirning v. Federal Reserve Bank, 8 Cir., 52 F.2d 382, 82 A.L.R. 297; Vann v. Federal Reserve Bank, D.C., 47 F.2d 786.

Fourth. We think there is no substance to the contention that this is a suit against the United States. In the Rhodes Case we denied a similar contention on behalf of the Alien Property Custodian. There is greater reason for denying it in the case of the Corporation for, notwithstanding the deposits consisted of moneys belonging to or in which the United States were interested, the contract itself was the contract of the Corporation; and the fact that the Corporation may not now possess any money nor be able to respond to a money decree against it may, as the Supreme Court said in the Sloan Shipyards Case, affect the value of the remedy but not defeat the remedy itself. The receiver is not suing the United States but the Corporation. If its act constituted a tort, as we think it did, the Corporation must respond. See U. S. Shipping Board Merchant Fleet Corp. v. Harwood, 281 U.S. 519, 50 S.Ct. 372, 74 L.Ed. 1011.

### The Suit Against the Canal Zone

The bill of complaint joins the Secretary of War and the Purchasing Officer of the Panama Canal, and the facts as to the pledge by the bank to secure Canal Zone funds are in all respects like those of the pledge in the Fleet Corporation Case. Money order funds of the Canal Zone were deposited in the bank and, it is claimed, illegally secured by a pledge of bonds made in 1910, to the Secretary of War. When insolvency came, the receiver of the bank mistakenly consented to a conversion of

the pledged assets. There is this difference in the two cases—in the Fleet Corporation Case it is claimed the money deposited in the bank was money of the United States, whereas in the instant case, it is neither alleged nor argued that the deposit is the money of the United States.

The bill alleges that the consent of the receiver (appellee) to the taking over of the pledged assets was given under a mistake of law; that the defendants (appellants) held the same in trust; and the prayer is that the court decree that the excess which appellants received over other general creditors be returned to the receiver. The answer challenges the right of recovery on the following grounds: (1) That authority for the pledge existed—if not directly then by custom and usage; (2) that the receiver is estopped by his conduct to demand recovery; and (3) that the United States are indispensable parties to the suit. The trial court on motion struck out the defenses, and upon appellants' election to stand upon their answer, final decree was entered for the sum of $368,327.71, with interest, which was the difference between the value of the pledged assets and the dividend which appellants were entitled to receive as general and unsecured creditors of the bank.

First. What has been said in the Fleet Corporation Case need not be repeated here. In O'Connor v. Rhodes, supra, following Texas & Pacific Ry. v. Pottorff, supra, and Marion v. Sneeden, supra, we held that R.S. § 5153, 12 U.S.C.A. § 90 is personal to the Secretary of the Treasury and grants no authority to a national bank to secure deposits of public money by public officers generally. It is necessary here, therefore, that appellants establish their claim of right to demand security, for without such authority the pledges were void and unlawful.

This brings us, then, to a statement of the facts necessary to an understanding of the case. By the Act of June 28, 1902, 32 Stat. 481, Congress authorized the acquisition of the Panama Canal Zone and provided for the establishment of a commission composed of seven members to co-operate with the President in the construction of the canal and the supervision and government of the Zone. By Act of April 28, 1904, 33 Stat. 429, Congress provided that "all the military, civil, and judicial powers as well as the power to make all rules and regulations necessary for the Government of the Canal Zone" should be vested in such person or persons as the President should direct. Pursuant to this authorization the President appointed a commission—subject to the control of the Secretary of War. The Secretary of War on June 24, 1904, directed the chairman of the commission to formulate a plan for "a practical and efficient postal service in said Canal Zone, and including such measures and provisions of the postal service of the United States as are not inapplicable to the conditions of law and fact existing in the Canal Zone." The Commission inaugurated a postal service for the Zone September 2, 1904. At that time there was no postal savings system in the United States. Provision for it and for securing deposits of postal savings funds was first made by Act of June 25, 1910, and was confined to continental United States, Alaska, and Puerto Rico, 39 U.S. C.A. § 759. A year later the President by executive order (September 8, 1911) established a postal deposit money order system for the Canal Zone. The order created a board of trustees consisting of the Collector of Revenue, the Auditor, and the Treasurer of the Canal Zone to supervise and administer it. The board thus constituted was given power "to make all necessary and proper regulations for the receipt, transmittal, custody, deposit, investment, and repayment of the funds deposited at postal savings depository offices." It is significant in this respect that the act creating the United States postal savings system directed and required the board of trustees provided for therein to take security from banks in which the postal savings funds were deposited, whereas in the executive order creating the Canal system and in the Act which authorized it there was no similar requirement. The board was left free to make rules and regulations for the general conduct of the system. So far as appears, no regulation requiring banks to give security for deposits was ever made. The executive order itself designated the Treasurer of the Zone as depository or custodian of the funds.

■ By Act of August 24, 1912, 37 Stat. 560, 48 U.S.C.A. § 1302 et seq., Congress validated generally all orders, rules, and regulations promulgated in the Canal Zone by authority of the President. But since there was not then an order or rule authorizing the securing of deposits, the

ratifying statute was wholly ineffective to confer the authority claimed by appellants here.

By executive order of September 5, 1914, effective October 1, 1914, the then existing postal savings system of the Canal Zone was terminated, and the order provided that thereafter "For the accommodation of persons desiring to deposit their savings in the post offices of the Canal Zone, money orders may be issued in the Canal Zone payable to the purchaser at the office of issue, for which no fee shall be charged." In accordance with this order deposit money orders were issued, and Congress in 1916, 39 Stat. 528, 48 U.S.C.A. § 1325, provided that such orders should bear interest at a rate not exceeding 2 per cent and also that "the interest received from the Canal Zone money-order funds deposited in banks under Canal Zone regulations shall be available to pay the interest on deposit money orders * * *." This Act was a recognition and approval by Congress of the executive order providing local machinery for the issuing of money orders. And it would appear also to constitute recognition and approval of the depositing of money-order funds under regulations. But the difficulty is that, so far as we can discover or have been advised, there were no regulations in this respect in existence.

Appellants next rely upon a regulation promulgated in 1923 and known as "Governor's Circular No. 660–61", as follows:

"Postal savings, money orders, clubhouse and other trust and security funds received shall be remitted to depositories in accordance with contracts entered into by the Secretary of War, and disbursed only on vouchers or warrants approved by the Auditor. Tolls and other revenues of the United States shall be deposited to the credit of the Treasurer of the United States in accordance with laws and regulations prescribed therefor, and any funds due the Panama Railroad Company in excess of currency transferred to the Pay-master shall be deposited to the credit of the Panama Railroad Company in local depositories * * *."

They insist that the circular was merely a recognition of what had been the former practice, which they claim had been ratified by the 1912 Act of Congress. We think the answer to their contention is, first, that the circular was promulgated about seven years after the passage of the Act (Act of 1916) which, as we have pointed out, was itself some three or four years after the formerly existing system had been abolished; and, second, that neither at the time of the passage of the Act nor at any time prior thereto was there any executive order, rule, or regulation effective in the Zone, or any Act of Congress, general or local, authorizing the Secretary of War to require bank security, or any Act of Congress specifically authorizing national banks to provide it. Nor was there such rule or regulation in effect at the time the circular was issued. And, finally, there was no authority of law then or thereafter whereby the Governor any more than the Secretary of War could make valid a pledge which the bank could not validly make. Hence, we think the most the prior approving Acts of Congress (Act of 1912—Act of 1916) professed to do, was to give recognition to such practices as had prior thereto been authorized by regulations promulgated by the President. And, as we have seen, no regulation authorizing the taking of a pledge to secure the deposits was ever so made. Congress has not at any time either directly or indirectly said that banks receiving Canal Zone postal funds shall give security for their safe return. And this specific authorization, the Supreme Court has held, is a condition precedent to the validity of a pledge.

It is next insisted that the later Act of February 16, 1933, 47 Stat. 812, 48 U. S.C.A. § 1323a, which we quote,[2] is in effect a ratification of the action and policy of the Secretary of War in requiring the

[2] "The postal service of the Canal Zone shall be governed by such of the laws, rules, and regulations of the Postal Service of the United States as are not inapplicable to the conditions existing in the Canal Zone, and the Governor of the Panama Canal is authorized to establish new post offices or discontinue those already established, to provide such rules and regulations as are necessary for the operation of the service, to appoint the personnel thereof, and to prescribe the postage stamps and other stamped paper which shall be used in such service: Provided, however, That the expenses of operating the Canal Zone postal service shall be defrayed, so far as possible, from the revenue derived therefrom, the use of which for that purpose is hereby authorized."

security. The Act provides that the postal service of the Canal Zone shall be governed by such laws and rules and regulations of the United States service as are not inapplicable to conditions existing in the Canal Zone. The Act authorizes the Governor to make rules and regulations necessary for the operation of the service. Presumably this authority was to be exercised to conform the local to the continental system in those respects in which it was considered that uniformity was desirable. If it be conceded that this included the right to make regulations to secure deposits of postal funds in conformity to the American system, it admittedly was not done. If it be likewise conceded that it included the right to demand security by "rule or regulation," admittedly also this was not done. The American system provided for a board of trustees, consisting of the Postmaster General, the Secretary of War, and the Attorney General, to deposit postal savings funds in solvent banks and to require security. 39 U.S.C.A. §§ 751, 759. But neither when the Act was passed nor at any subsequent time was there a similar board in office under the Canal system. Nor at any time thereafter did the Governor make any rule or regulation requiring funds to be deposited in banks or any rule or regulation authorizing or requiring exaction of a pledge as security. In this state of the record it seems clear that the action of the Secretary of War in 1910 in requiring the pledge was unauthorized, because it was unsupported by any statute, rule, or regulation then or thereafter in effect.

This brings us, then, to the question of whether the practice shown to have existed in this case created a custom or usage which legalized the pledge. The answer must be in the negative. While the pledge was made and taken in good faith, it violated the provisions of the National Bank Act, 12 U.S.C.A. § 21 et seq., designed to secure uniformity in the treatment of depositors. Texas & Pacific Ry. v. Pottorff, supra. Since the bank was without power to pledge its assets to secure deposits, the pledge was absolutely invalid, and the length of time of the pledge and the good faith of the transaction cannot give it validity. City of Fort Worth v. McCamey, 5 Cir., 93 F.2d 964; Leonard v. Gage et al., 4 Cir., 94 F.2d 19. Nor can custom create a valid contract where the power to make it is nonexistent. Besides, no custom of national banks generally in relation to the pledge of assets to secure deposits is shown—certainly to no greater extent than was true in the Pottorff and Sneeden Cases where a similar contention was denied.

Second. We do not think the receiver is estopped to maintain the suit because he agreed, at the instance of the Comptroller of the Currency, that the pledged securities should be taken over by the Secretary of War. The receiver is an officer of the United States, Ex Parte Chetwood, 165 U.S. 443, 17 S.Ct. 385, 41 L.Ed. 782, and estoppel does not lie against such an officer to recover money paid out under mistake of law. Texas & Pacific Ry. v. Pottorff, supra; O'Connor v. Rhodes, supra. The answer to this contention is well expressed in Hood v. Hardesty, Receiver, 4 Cir., 94 F.2d 26, where it was said in a similar case [page 29]: "On the second question, the position of defendant is that there was a voluntary payment of defendant's deposit under mistake of law, and that payment so made cannot be recovered. There are two answers to this; first, that the receiver of a national bank is an administrative officer of the United States and is not bound by the rule precluding the recovery of money voluntarily paid under mistake of law; second, that to permit the assets of the failed national bank to be thus applied in extinguishment of unsecured claims for deposits would contravene the federal statutes forbidding preferences to creditors and requiring the equal and ratable distribution of assets."

See, also, Leonard v. Gage, 4 Cir., 94 F.2d 19, 23, 24; Rusch v. Baer, D.C., 18 F.Supp. 732.

Third. We think the United States are not indispensable parties to this suit and that this is not a suit against the United States. The argument is that the loss which will result from the recovery of the bonds or the proceeds of the bonds will be the loss of the United States because of a moral obligation to repay the holders of deposit money orders, and that, in these circumstances the United States are indispensable parties and have not consented to be sued. In O'Connor v. Rhodes we said on this point in the case against the Alien Property Custodian that the suit could not be defeated on the theory that it was one against the United

States. We think this was right. If a suit were brought against the Alien Property Custodian for the recovery of seized property and the evidence showed that the Custodian had erroneously turned over the property to another person not entitled thereto, it would be no defense to say that a judgment against the Custodian would, because of a moral obligation, have to be satisfied ultimately by the United States. Cf. Becker Steel Company v. Cummings, 296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54. We think the same reasoning applies here. The proceeds of the pledge sought to be recovered in this suit do not belong to the United States and have not been covered into the Treasury. Nor is there any law under which they can be so covered. The money which the Secretary of War has is money of the bank out of which all creditors are entitled to be paid ratably. In these circumstances it is of no consequence what the United States may or may not do about the deficiency in the Canal Zone postal funds, if one should exist. The question is rather, whether there was a valid authorization for the pledge. If there was not and the Secretary of War participated in a conversion of the bank's assets, he must restore the bonds or refund the proceeds from their sale. The pledged bonds or their proceeds are in the hands of the Secretary of War, and the rule which we think the cases cited lay down requires him now to respond to judgment just as any other person who had participated in a preferential transfer would be compelled to respond.

### The Case of Inland Waterways Corporation

The allegations of the bill as to Inland Waterways Corporation parallel in all respects the charges against Fleet Corporation and Canal Zone. The circumstances as to the pledges were the same in all three cases. The grounds of defense were likewise the same, including the ground stressed here that the Corporation is an instrumentality of Government created to carry out the purposes declared in the Transportation Act of 1920 (41 Stat. 456), that its assets are assets of the Government and its money public moneys, and that any decree against it would materially affect the United States. There is this additional ground—that the receiver's remedy, if he has any, is at law.

The trial court decreed against the Corporation for the value of the pledged assets, less the dividend paid to other creditors of the bank.

The status of the Inland Waterways Corporation is as follows: It was created by Act of Congress June 3, 1924 (43 Stat. 360, 49 U.S.C.A. §§ 151–156). Its capital stock was fixed at fifteen million dollars and was wholly subscribed and paid for by the United States. The purpose of its creation was to continue through a corporate organization the operation of the barge and towboat transportation system then conducted under the direction of the Secretary of War on certain inland waterways of the country. The Act provides that, after the Corporation shall have been organized, it shall carry on the business of a common carrier of freight by water, conforming in all respects to the laws applicable to railway transportation, and the Interstate Commerce Commission is given authority to fix rates and, generally speaking, to exercise the same control exercised over common carriers by rail. It is provided the Corporation should be managed by a board of directors and such other officers and servants as should be necessary in the conduct of the business. It should have succession in its corporate name during its existence; could sue and be sued in its corporate name and adopt a corporate seal; make contracts; acquire, hold, and dispose of property; employ and pay officers and employees; and conduct the business of a common carrier by water and generally have such powers as are necessary to carry out the purposes of its creation. In short, it was created to to function in all respects as a private corporation. In this state of the record we think the argument in favor of immunity is no more persuasive here than in the case of Fleet Corporation, and that, like Fleet Corporation, it is liable for its wrongful acts just as in the case of any private corporation. Sloan Shipyards Corp. v. United States Fleet Corporation, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762; Skinner & Eddy v. McCarl, 275 U.S. 1, 48 S.Ct. 12, 72 L.Ed. 131; U. S. Shipping Board Merchant Fleet Corp. v. Harwood, 281 U.S. 519, 50 S.Ct. 372, 74 L.Ed. 1011.

Since no useful purpose will be served in repeating what has been said in the other cases as to the invalidity of the pledge and the right of the receiver

to demand and receive back the pledged security, the only other question left for discussion is whether the suit can be maintained in equity. We think it can. It is well established that one who participates in a breach of trust may be held liable in a court of equity to account for the trust property or its proceeds or to respond in damages. Bank of Giles County v. Fidelity & Deposit Co., 4 Cir., 84 F.2d 321, 324. The purpose of the bill is to recover the bonds for the benefit of the creditors of the bank, who· are entitled to have them or their proceeds administered as a trust. The charge is that the Corporation illegally received the bonds and holds them or the proceeds thereof as trustee for the bank's creditors. The theory of this is that the bonds or their proceeds belong to the creditors; that they represent trust funds to the same extent as the other assets of the bank; that their transfer to the Corporation was illegal; ·and that a· court of equity has power to impress the fund in the hands of the Corporation with a lien. Unquestionably, since—as we hold —the pledge was illegal, its effect was to create an unlawful preference.` The suit is to set aside the preference and recover the proceeds, and the practice in like circumstances has been to sue in equity. An examination of the cases since the Pottorff Case, in which similar pledges were held illegal, shows that in the great majority of them the proceeding was in equity, and in Webb v. American Surety Co., 5 Cir., 88 F.2d 171, Judge Hutcheson said on this question [page 175]: "I think this suit is one essentially in equity, requiring the equitable application of the principles of recoupment and set-off, and the granting of equitable relief."

And in another similar case Judge Parker said: "Defendant * * * has received, from the proceeds of the bonds improperly pledged, funds to which he is not legally entitled. * * * It is well settled that in such a case a court of equity will direct restitution." Hood v. Hardesty, 4 Cir., 94 F.2d 26, 29.

The result of declaring the pledge void is to insure a ratable distribution of the trust fund to· the creditors of the bank. Considered in that view, and it appearing that the Corporation has money in its hands which in equity belongs to someone else, a court of equity has power to order it paid to the person entitled to it.

We are, therefore, of opinion in this case, as in the others, that the decision of the lower court is correct and should be, and is, affirmed.

. Affirmed.