INLAND WATERWAYS CORP. ET AL. *v.* YOUNG, RECEIVER.

·No. 6.   Argued October 11, 1939.—Decided March 25, 1940.

*Assistant Attorney General Shea,* with whom· *Solicitor General Jackson* and *Mr. Paul A. Sweeney* were on the brief, for petitioners.

*Messrs. Swagar Sherley* and *George B. Springston,* with whom *Messrs. Charles F. Wilson* and *George P. Barse* were on the brief, for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The question before us is whether a national bank may pledge assets to secure deposits of funds made by governmental agencies, even though they may not be "public money" within the scope of § 45 of the National Banking Act, 13 Stat. 99, 113, 12 U. S. C. § 90.

The deposits in question were made with the Commercial National Bank by three separate governmental agencies—by the Inland Waterways Corporation and the

United States Shipping Board Merchant Fleet Corporation,[1] and by the Secretary of War on behalf of the Panama Canal Zone. After the bank's insolvency the present suit was instituted by the receiver, respondent here, for the recovery of the pledged assets or their proceeds to the extent of the amount in excess of the dividends paid to the general depositors. The District Court granted respondent's motion to strike out portions of the petitioners' answers asserting the validity of the pledges. The petitioners stood their ground, and decrees pro confesso for the respondent followed. The Court of Appeals for the District of Columbia affirmed, 69 App. D. C. 268; 100 F. 2d 678, and we granted certiorari, 306 U. S. 626, because the controversy raised matters of importance in the administration of the National Banking Act.

At the threshold we are met by two recent decisions of this Court, Texas & Pacific Ry. Co. v. Pottorff, 291 U. S. 245, and Marion v. Sneeden, 291 U. S. 262. In view of the thorough consideration which these two cases received and the added weight which they derive from the authority, in the field of banking, of Mr. Justice Brandeis, the writer of the opinions, we start with full acceptance of what they decided.

The Pottorff case held that a national bank was without authority to pledge its assets as security for private deposits. In the absence of specific authority to make such pledges, the general policy of the Act and principles of sound banking practice were drawn upon to establish the prohibition. To allow the withdrawal of assets of the bank from general availability would impair the bank's liquidity—its ability to meet unexpected demands by depositors—and thereby restrict the national banking system as a reliable instrument of national finance. In the Sneeden case the banking standards relied upon, in

---

[1] Both these corporations are wholly owned by the United States.

the *Pottorff* case were applied likewise to deny to national banks power to pledge their assets as security for deposits by state and local governmental agencies except where permission is given by the Act of June 25, 1930, 46 Stat. 809, 12 U. S. C. § 90.[2]

But the function of national banks as depositaries of federal-funds was not before the Court in the *Pottorff* and *Sneeden* cases, and the power of the banks in relation to such funds could not have been decided there. That power is the exact issue here. The solution of this problem, however, must be found by application of those standards for judgment which were decisive in the former cases. In other words, the history and purposes of the statute and the traditional policy of the National Government in utilizing the national banks as fiscal agencies must give meaning to the silence of the Act.

Congress has necessarily been concerned from the beginning to provide appropriate safeguards for government funds. One of the motives in the establishment of the first Bank of the United States was its availability as a safe depositary for such funds. They were kept there until the expiration of that Bank's charter in 1811. Thereafter and until the second Bank of the United States was chartered, government monies were kept in state banks. These deposits were without security, and as a consequence severe losses followed the financial dislocation which came with the War of 1812. This experience led the Government to exact security, and losses became negligible. Phillips, Methods of Keeping the

---

[2] *Lewis* v. *Fidelity & Deposit Co.*, 292 U. S. 559, involved merely the application of the *Sneeden* doctrine to the special circumstances presented by Georgia legislation in the case of national banks situated in that State. The *Lewis* case, like the *Pottorff* and *Sneeden* cases, did not bring into issue the power of national banks with reference to federal deposits. Of course, the *Lewis* case neither professed to enlarge, nor could it, the scope of the *Pottorff* and *Sneeden* decisions.

Public Monies of the United States, pp. 6–20; H. Rep. No. 358, 21 Cong., 1st Sess., Vol. 3, p. 12; IV McMaster, History of the People of the United States, p. 295 *et seq.*; III American State Papers, Finance, p. 11. The second Bank of the United States, established partly to serve as a Government depositary, kept most of the federal funds until their withdrawal in 1833 by Secretary Taney. But as a condition to their deposit in various state banks after 1833, Taney, acting upon the earlier experience of the Treasury under Secretaries Gallatin and Crawford, exacted appropriate security.[3] By the Act of June 23, 1836, 5 Stat. 52, Congress translated Treasury practice into legislative policy. It thereby became the Secretary's duty, whenever wisdom dictated, to require collateral for Government funds. As a result security was demanded of almost all the depositaries. Phillips, *op. cit.*, p. 63. The panic of 1837 brought another modification. Government monies were held by the local collectors and by the Treasury itself, and a little later deposited in the new Sub-Treasury. But in 1841 the old method of deposit in state banks was resumed under the practice which had been introduced in 1833. Exec. Doc. No. 123, 27th Cong., 2nd Sess., p. 2; Phillips, *op. cit.*, p. 113. This arrangement—that is, deposits secured by collateral—continued until the Sub-Treasury Act of 1846, 9 Stat. 59, led to the withdrawal of Government funds from private banks. The sub-treasury system persisted until the establishment of the modern national banking system.

---

[3] These conditions, incorporated in contracts between the Treasury and the banks, required collateral to be pledged for all deposits in excess of one-half the bank's paid-in capital. In addition the Treasury reserved the right to demand additional security whenever it was thought prudent. Exec. Doc. No. 2, 23rd Cong., 1st Sess., Vol. 1, p. 36; Phillips, *op. cit.*, pp. 53–55; Girard, The Independent Treasury, p. 17.

The policy of securing Government deposits thus antedates the National Banking Act. It was the practical response to disastrous experience. It began without any statutory authorization, and was continued both with and without specific Congressional sanction. Long practice and Congressional approval lodged in the Secretary of the Treasury authority to take appropriate measures to safeguard the nation against loss of its funds. The integrity of Government monies was naturally considered an object of great national importance, the attainment of which properly belonged to those entrusted with their disposition.

It is against this background that the National Banking Act of 1864 must be projected, intended as it was to provide facilities for the deposit of Government funds. Congress was alive to the Treasury's experience with deposits, secured and unsecured, during the preceding decades, together with the policy which had evolved from that experience. Cong. Globe, 37th Cong., 3rd Sess., Pt. I, pp. 843–45. The banking system which Congress thus established embodied a blend of governmental and private purposes. See *Mercantile Bank* v. *New York*, 121 U. S. 138, 154; Davis, The Origin of the National Banking System, S. Doc. No. 582, 61st Cong., 2nd Sess.

By § 45 of the Act, Congress specifically commanded the Secretary of the Treasury to exact security for "public monies" deposited by him in national banks. R. S. § 5153 (12 U. S. C. § 90). We read this as an exaction of duty from the Secretary as to monies subject to his control, see *Cook County Nat. Bank* v. *United States*, 107 U. S. 445, 449, and not as a limitation upon the power of the bank to give security when it may be required by other Government officers and agencies charged with the custody of federal funds. Placing § 45 in the setting of its history, we do not think it should be read in a nig-

gardly spirit, as though it expressed a gingerly departure from public policy. On the contrary, it is a manifestation of historic national practice, which is to be given scope consonant with the reason for its development. Compare *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381. By a series of specific statutory commands, Congress has recognized the power of national banks to give security for deposits of a governmental nature by laying upon various agencies, charged with the custody of such funds, a duty to exact collateral. See § 61 of the Bankruptcy Act, 30 Stat. 562; § 9 of the Postal Savings Act, 36 Stat. 816; and Acts relating to Insolvent Bank Funds, 39 Stat. 121; Porto Rican Funds, 39 Stat. 951; Government Obligations, 40 Stat. 291 and Indian Monies, 40 Stat. 591. With one exception all these special statutory requirements pertain to funds held by the Government for the benefit of others. It is difficult to suppose that what Congress has commanded with respect to funds held by its agencies in an immediate fiduciary capacity, it would deem a violation of law if done with respect to funds beneficially owned by the United States itself. What may be inimical to the private aspects of the national banking system, and therefore *ultra vires*, has no such relevance to the public aspect of national banks, and to the enforcement of the public interest by those charged with primary responsibility for its guardianship.

So far as the powers of a national bank to pledge its assets are concerned, the form which Government takes— whether it appears as the Secretary of the Treasury, the Secretary of War, or the Inland Waterways Corporation—is wholly immaterial. The motives which lead Government to clothe its activities in corporate form are entirely unrelated to the problem of safeguarding governmental deposits, and therefore irrelevant to the issue of *ultra vires*. Compare *Skinner & Eddy Corp.* v. *Mc-*

*Carl*, 275 U. S. 1, 8.[4]   The true nature of these modern devices for carrying out governmental functions is recognized in other legal relations when realities become decisive.   Compare *Clallam County* v. *United States*, 263 U. S. 341; *Emergency Fleet Corp.* v. *Western Union*, 275 U. S. 415.   The funds of these corporations are, for all practical purposes, Government funds; the losses, if losses there be, are the Government's losses.   Compare *U. S. Grain Corp.* v. *Phillips*, 261 U. S. 106, 113.   See Seventeenth Annual Report, U. S. Shipping Board, 1933, pp. 88–89, for summary of losses borne by Treasury on behalf of the Merchant Fleet Corporation, and compare Annual Report, Inland Waterways Corporation, 1936, pp. 16–22.

The policy underlying Congressional legislation and reflected in the history of governmental deposits is confirmed by the explicit recognition of that official in whom is centered oversight of the administration of the National Banking Act.   S. Doc. 175, 73rd Cong., 2nd Sess. The Comptroller of the Currency, to be sure, must himself move within the orbit of the National Banking Act. Illegality cannot attain legitimacy through practice.   But when legality itself is in dispute—when Congress has spoken at best with ambiguous silence—a long continued practice pursued with the knowledge of the Comptroller of the Currency is more persuasive than considerations of abstract conflict between such a practice and purposes attributed to Congress.   More than half a dozen agencies have thought it their duty to safeguard deposits in nearly a hundred banks by transactions similar to those before us.   This practice had the approval of the Comptroller because he believed it within the scope of the National

---

[4] See McDairmid, Government Corporations and Federal Funds, 31 Am. Pol. Science Rev. 1095; Federal Corporations and Corporate Agencies, 16 Harv. Bus. Rev. 436.   The corporations, of course, perform "governmental" functions.   *Graves* v. *O'Keefe*, 306 U. S. 466.

Banking Act. Even constitutional power, when the text is doubtful, may be established by usage. See *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 473. When dealing with such necessarily argumentative concepts as those of which the law of *ultra vires* is so largely composed, the responsible and pervasive practice of public officers bent on safeguarding the public interests ought to carry the day even were the issue more in doubt than we believe it to be.

Deeming the challenged pledges to have been validly made, we think petitioners were entitled to judgment. It is therefore unnecessary for us to consider the other arguments here urged in their behalf. The judgments below should be ·

*Reversed.*

MR. JUSTICE REED and MR. JUSTICE MURPHY took no part in the disposition of this case.

MR. JUSTICE ROBERTS, dissenting:

The court below followed and applied the decisions of this court in *Texas & Pacific Ry. Co.* v. *Pottorff*, 291 U. S. 245, *Marion* v. *Sneeden*, 291 U. S. 262, and *Lewis* v. *Fidelity & Deposit Co.*, 292 U. S. 559.

It is true that those cases presented the question whether national banks are authorized to give security for private deposits and those of state agencies. But the basis of each of the decisions was that national banks are without power to pledge assets as security for *any* deposits, in the absence of express legislative sanction. Paradoxically, the opinion of the court, while recognizing the authority, in the field of banking, of Mr. Justice Brandeis, who announced the opinions in all three cases for a unanimous court, rejects the fundamental principle of the opinions. Whereas in the *Lewis* case Mr. Justice Brandeis announced in plain terms that, in the absence of express authorization, a national bank has "no power

to make any pledge to secure deposits except the federal deposits specifically provided for by Acts of Congress," the opinion of the court spells out such power despite "the silence of the act."

In the *Texas & Pacific* and *Marion* cases the opinions point out that whenever Congress has intended that security should be taken for deposits of government funds specific authority has been granted.[1] That what was thus said by Mr. Justice Brandeis was deemed necessary to the decisions and was the deliberate conclusion of the court is evidenced by his statement in *Lewis* v. *Fidelity Co.,* at p. 564:

"In *Texas & Pacific Ry. Co.* v. *Pottorff,* 291 U. S. 245, and *Marion* v. *Sneeden,* 291 U. S. 262, . . . we held that a national bank had, prior to the Act of June 25, 1930, no power to make any pledge to secure deposits except the federal deposits specifically provided for by Acts of Congress."

Now it is said that these cases incorrectly state the governing principle. That principle is now said to be that Congress cannot have intended to limit the authority of banks to give security in cases where administrative officers in charge of government funds have deemed it appropriate that security should be given. In other words, despite the withholding of any grant of power to institutions whose powers are only those granted,[2] a power is spelled out.

The attempt to buttress the implication of the power from the fact that federal agencies have heretofore exacted security, and that the Comptroller of the Currency has been of the view that such pledges were not

---

[1] See *Texas & Pacific Ry. Co.* v. *Pottorff,* p. 257, Note 11; *Marion* v. *Sneeden,* p. 268.

[2] "The measure of their powers is the statutory grant; and powers not conferred by Congress are denied." *Texas & Pacific Ry. Co.* v. *Pottorff,* p. 253.

in violation of the Act, is answered by what was said in *Marion* v. *Sneeden* (p. 269):

"comptrollers of the currency knew that this was being done; and they assumed that the banks had power so to do. But the assumption was erroneous."

I think that as the Court of Appeals followed the principle rightly applied in the decisions of this court its judgment should be affirmed.

The CHIEF JUSTICE and MR. JUSTICE McREYNOLDS join in this opinion.