**NATIONAL CORED FORGINGS CO.,
Inc., and Marloch Manufacturing
Corporation**

v.

**The UNITED STATES.**

**No. 50420.**

United States Court of Claims.

June 7, 1955.

David Cobb, Washington, D. C., Cobb & Weissbrodt, Washington, D. C., on the briefs, for plaintiffs.

Bruce G. Sundlun, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

The plaintiffs sue to recover $309,799.29 as damages for breach of their contract with the defendant, or in the alternative, for fair compensation under section 17(a) of the Contract Settlement Act of 1944, 58 Stat. 665, 41 U.S.C. § 117 (1946 Ed.), 41 U.S.C.A. § 117(a), for services rendered without a formal contract, and as a third alternative, the plaintiffs seek reformation of an agreement in writing on the ground of mutual mistake and of misrepresentations by the defendant and for damages for breach of the agreement as reformed.

Plaintiff National Cored Forgings Company, Incorporated (hereinafter referred to as National), is successor by change of name to the Greenport Basin and Construction Company (hereinafter referred to as Greenport). Plaintiff Marloch Manufacturing Company (hereinafter referred to as Marloch) was incorporated in the State of New York in 1946, as a wholly owned subsidiary of Greenport. In the course of its dissolution in 1947, all of Marloch's assets, including the claims here asserted, were transferred to Greenport.

At the close of World War II there was a very serious housing shortage, sharply accentuated by the large number of veterans then returning to civilian life. In an effort to alleviate this shortage, Congress passed the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 50 U.S.C.App. § 1821 et seq. (1946 Ed.), 50 U.S.C.A.Appendix, § 1821 et seq. Section 12 of the Act provided that the powers vested in the Reconstruction Finance Corporation (hereinafter referred to as RFC) might be used to underwrite or guarantee markets for new type building materials and prefabricated houses, but only to the extent that the Housing Expediter[1] found this necessary to assure a sufficient supply for the veterans' emergency housing program. This section also contained the standards to be applied by the Housing Expediter to such underwriting or guaranty.

We are here concerned with a controversy growing out of a contract entered into pursuant to the market guarantee program established by section 12 of the Veterans' Emergency Housing Act, supra.

The facts which are not disputed may for purposes of this decision be summarized as follows: Pursuant to a directive of the Office of the Housing Expediter (hereinafter referred to as OHE) issued under section 12 of the Act, the RFC entered into a market guarantee contract with General Houses, Incorporated (hereinafter referred to as General Houses), an Illinois corporation, for the production of 2,000 prefabricated

---

1. Section 2 of the Act created the Office of the Housing Expediter, and defined the functions and powers of the Housing Expediter. These included the formulating of plans and programs to provide for an increased supply of housing accommodations, the issuance of orders, regulations, or directives to other executive agencies, etc.

housing units by the end of 1947. The contract, dated February 7, 1947, contained a provision that the RFC would purchase from General Houses, at a price to be determined in accordance with a formula contained in the contract, the prefabricated houses not otherwise sold by General Houses.

General Houses was unable to get into production under the contract, and in early March of 1947 it approached Marloch and entered into an informal arrangement whereby Marloch would manufacture the houses at its plant with its own funds, and General Houses would act as selling agent for Marloch. This arrangement was contingent upon obtaining the Government's consent.

Thereafter meetings were held with representatives of the OHE and RFC for the purpose of obtaining the consent of the Government. As a prerequisite to entering into production of the houses Marloch indicated that it desired a transfer to it of the market guarantee contract. The OHE official who had been instrumental in negotiating the market guarantee contract expressed his approval of the new arrangement. OHE stated that an assignment of the market guarantee agreement could be made, but that the detailed administrative procedure required would take several weeks and perhaps months. OHE counsel suggested an assignment of the moneys due or to become due under the contract as a satisfactory method of affording Marloch the basic protection of the market guarantee agreement. This method met with approval and Marloch was requested to, and did, begin production immediately.

Pursuant to the oral arrangements with the Government reached at the meeting, Marloch and General Houses executed an instrument in writing dated March 14, 1947, whereby Marloch agreed to produce the 2,000 houses and General Houses agreed to sell them. On March 27, 1947, Marloch and General Houses executed an assignment under which Marloch agreed to perform all of the obligations of General Houses under the market guarantee contract. In the instrument the RFC was requested, directed, and authorized to pay to Marloch any or all moneys due or to become due from RFC to General Houses pursuant to the contract, but General Houses was to remain liable to RFC under the terms of the contract to the same extent as if the assignment had not been made. This instrument was a standard RFC form assignment of moneys due which was modified and adapted by an employee of RFC and then submitted to Marloch and General Houses for execution. The terms of the March 27 instrument were accepted and approved by RFC.

Marloch completed its first houses in May of 1947, and by June its plant was geared to produce at the rate of 20 units per day. It had no orders to fill because General Houses had not been able to obtain orders.

Marloch became compelled to seek additional financing. The bank to which it went indicated a willingness to make a loan directly to Greenport, Marloch's parent company, upon the collateral of the market guarantee contract. Marloch consulted legal counsel as to the procedures for transferring the contract from it to Greenport, and was apprised that the assignment of March 27 might have been ineffective to give Marloch the market guarantee protection it thought it had obtained.

Marloch then sought a meeting with the Government officials in charge of the market guarantee program. At a meeting held in July of 1947, OHE gave consideration to transferring the General Houses' market guarantee contract to plaintiffs. Shortly thereafter, however, the Government representative took the position that Marloch did not have a contract with the Government, and despite Marloch's urgings, this position was consistently maintained. Marloch discontinued production and liquidated the prefabricated housing enterprise.

Claims were then filed against the OHE and the RFC under section 17 of the Contract Settlement Act, supra. The

claims were denied whereupon they were appealed to the Appeal Board of the Office of Contract Settlement. The Board granted a motion of OHE to dismiss the appeal as to it because OHE was not a "contracting agency" within the definition of section 3(g) of the Contract Settlement Act, supra, 41 U.S.C.A. § 103(g), and held that Marloch had not proceeded "without a formal contract" within the meaning of section 17(a) of the Act. National Cored Forgings Co., Inc. v. Reconstruction Finance Corporation, 5 App.Bd. OCS No. 353.

Plaintiff thereafter timely filed a petition in this court on November 20, 1951.

On the same day that the petition was filed in this court, plaintiffs filed a complaint in the U. S. District Court for the District of Columbia, asserting there the same claims here involved, against the RFC alone, in its corporate capacity and in its own behalf. Plaintiffs and the RFC have filed a stipulation for stay of proceedings in the District Court until final action has been taken by this court.

On January 18, 1952, defendant filed a motion to dismiss plaintiffs' petition on the ground that since plaintiffs had pending in the U. S. District Court for the District of Columbia another suit seeking the same relief on the same claim, this court had no jurisdiction under the provisions of 28 U.S.C. (Supp. V) § 1500 (1946 Ed.), quoted infra. After oral argument, the motion to dismiss was overruled by an order dated May 6, 1952. Defendant then filed an answer to the petition in which it asserted as special defenses (1) the failure of the petition to state a cause of action, (2) the lack of jurisdiction in this court on the ground relied on in its motion to dismiss, and (3) that under the provisions of section 13(b) (2) of the Contract Settlement Act, 41 U.S.C.A. § 113(b) (2), this court had no jurisdiction over suits where the RFC was the contracting agency. Defendant also set forth as an affirmative defense that plaintiffs were not entitled to relief under the Contract Settlement Act since the petition showed that plaintiffs had not met the requirements of section 17(a) of the Act.

Plaintiffs filed a motion to strike the special defenses on the ground that they were insufficient. Defendant then filed an answer to plaintiffs' motion to strike and a motion for judgment on the pleadings.

On September 30, 1953, this court rendered a decision overruling defendant's motion for judgment on the pleadings and striking the defenses of failure of the petition to state a cause of action under the general jurisdiction and lack of jurisdiction in this court under the provisions of 28 U.S.C. (Supp. V) § 1500 (1946 Ed.), and remanded the case for a hearing. National Cored Forgings Co., Inc., v. United States, 115 F.Supp. 469, 126 Ct.Cl. 250.

In striking defendant's defense under 28 U.S.C. § 1500, this court followed First National Steamship Company v. United States, 90 Ct.Cl. 632. In that case the petitioner had a suit pending in the District Court against the Fleet Corporation in its corporate capacity and was suing the United States in this court on the same cause of action for the acts of the Fleet Corporation as the agent of the United States. The court in that case said that section 154 of the Judicial Code, 36 Stat. 1087, 1138, which was the predecessor of section 1500,[2] was inapplicable because the suit in the District Court was against the corporation in its corporate capacity, whereas the suit in this court was against the United States, and further the petition in the District Court did not allege that the corporation was acting or professing to act under the authority of the United States.

Although this court on two occasions overruled the defendant's plea of lack

2. The Reviser's Notes of the 1948 codification of Title 28 U.S.C. states that "changes were made in phraseology."

However, the insertion of the words "United States" was a substantive change but has no bearing on this case.

of jurisdiction of this court by reason of 28 U.S.C. § 1500, and allowed the case to go to trial, defendant still maintains that this court lacks jurisdiction because of plaintiffs' pending suit in the District Court. Inasmuch as this question goes to the jurisdiction of this court, it is considered first.

■ Upon further consideration of this jurisdictional question, we are of the opinion that the First National Steamship Company case, supra, should have been overruled rather than followed. Section 1500 provides:

"Pendency of claims in other courts.

"The Court of Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States."

By the express terms of this section, this court is deprived of jurisdiction of any claim in respect to which the plaintiff has pending in any other court a suit against any person who, at the time when the cause of action alleged in such suit arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States. The obvious and declared purpose of this provision was to require an election between a suit in this court against the United States and one brought in another court against an agent of the United States. Matson Navigation Co. v. United States, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336.

■ The RFC and the other Government corporations are agents of the United States and clearly, when their acts are within their statutory authority, they are acting under the authority of the United States. Cherry Cotton Mills, Inc., v. United States, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835; Ex parte Skinner & Eddy Corporation, 265 U.S. 86, 44 S.Ct. 446, 68 L.Ed. 912.

■ When a Government corporation acting within the scope of its statutory authority makes a contract as the agent of the United States, the United States may be sued in this court as principal on the contract. Crooks Terminal Warehouses, Inc., v. United States, 92 Ct.Cl. 401; John Morrell & Co. v. United States, 89 Ct.Cl. 167. This does not mean, however, that the corporation may not be sued for its action. The RFC is specifically given the power to sue and be sued in any court of competent jurisdiction, state or federal, 47 Stat. 5, 15 U.S.C. § 603, 15 U.S.C.A. § 603. The Supreme Court in Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, at page 390, 59 S.Ct. 516, at page 518, 83 L.Ed. 784, where the question was whether a subsidiary of the RFC was subject to suit when Congress had not specifically granted consent to have it sued, held that it was subject to suit and stated:

"Because of the advantages enjoyed by the corporate device compared with conventional executive agencies, the exigencies of war and the enlarged scope of government in economic affairs have greatly extended the use of independent corporate facilities for governmental ends. In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included. Such a firm practice is partly an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope."

See Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation and the United States, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762.

For purposes of immunity from suit, priority of debts in bankruptcy, and certain criminal statutes the "present climate of opinion" has been to treat Government corporations substantially the same as private corporations. Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation and the United States, supra; Keifer & Keifer v. Reconstruction Finance Corporation, supra; Reconstruction Finance Corporation v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; United States v. Strang, 254 U.S. 491, 41 S.Ct. 165, 65 L.Ed. 368. But as stated by the Supreme Court in Inland Waterways Corporation v. Young, 309 U.S. 517, 524, 60 S.Ct. 646, 650, 284 L.Ed. 901, "The true nature of these modern devices for carrying out governmental functions is recognized in other legal relations when realities become decisive." The Supreme Court in Cherry Cotton Mills, Inc., v. United States, supra [327 U.S. 536, 66 S.Ct. 730], where the question was whether a sum of money due petitioner from the United States could be offset against a sum of money petitioner owed the RFC, in holding that the offset was proper, stated: "That the Congress chose to call it [RFC] a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely Governmental purposes."

■ We are of the opinion that when the RFC acts within its statutory authority it contracts both in its corporate capacity and as an agent of the United States and that an aggrieved contractor with the RFC may bring his cause of action in either the District Court against the corporation or in this court against the United States. But it cannot bring a suit on the same cause of action or claim in both courts because of the prohibitions of section 1500, supra.

Ex parte Skinner & Eddy Corporation, supra, is controlling on this jurisdictional question. The Supreme Court there held that this court was deprived of jurisdiction when the petitioner filed a suit in the state court because of section 154 of the Judicial Code, supra. The Court said at page 95 of 265 U.S., at page 448 of 44 S.Ct.:

"But there is a special reason why the rule must be enforced in this case. By section 154 of the Judicial Code, it is provided that:

" 'No person shall file or prosecute in the Court of Claims, or in the Supreme Court on appeal therefrom, any claim for or in respect to which he or any assignee of his has pending in any other court any suit or process against any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, mediately or immediately, under the authority of the United States.'

" * * * That suit and the section of the Code just quoted necessarily prevent the petitioner from suing on those claims in the Court of Claims, and exclude its jurisdiction of them, because the Fleet Corporation which is sued in the Washington court was certainly acting or professing to act, mediately or immediately, under the authority of the United States. * * * "

■ The plaintiffs' petition, therefore, must be dismissed because they have the same cause of action or claim pending in the District Court against the RFC, who was acting directly or indirectly under the authority of the United States.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.