**FARLEY et al. v. ALBERS.**

**No. 7211.**

United States Court of Appeals for the District of Columbia.

Argued Feb. 8, 1939.

Decided April 29, 1940.

David A. Pine, U. S. Atty., Leslie C. Garnett, Sp. Asst. to Atty. Gen., and H. L. Underwood, Asst. U. S. Atty., all of Washington, D. C., for appellants.

Llewellyn A. Luce, of Washington, D. C., and Homer D. Dines and John D. Cooke, Jr., both of Chicago, Illinois, for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This is an appeal from a decree ordering appellant Julian, as Treasurer of the United States, to deliver to appellee, receiver of Woodlawn Trust and Savings Bank, certain bonds pledged by the bank to secure the deposit of United States postal savings funds, and also ordering the Postmaster General, Secretary of the Treasury, and Attorney General, as Trustees of the Postal Savings System, to pay over to the receiver $106,657.96, the proceeds of the redemption of certain of the pledged bonds and interest collected since the bank receivership.

Woodlawn Bank is an Illinois banking corporation organized in 1905. In 1932 the State Auditor of Public Accounts found its capital impaired, and appointed a receiver. The bank has been in liquidation ever since, and to date 30 per cent has been paid to the depositors. Albers, appellee, is the present receiver. From 1911 to 1932 the bank had been a depository of postal savings funds, and on the date of its closing held deposits of such funds to the amount of $454,793. Suit was instituted October 28, 1935, by the receiver of the bank against the three cabinet officers as trustees, and the Treasurer of the United States, as Treasurer of the postal savings system, in their official capacities. The District Court found as facts that since 1911, upon application of the bank, the trustees of the system had caused to be deposited in the bank postal savings funds, to secure the repayment of which the bank had from time to time turned over and delivered to the Treasurer of the United States various bonds which were part of its assets, and that as of the date of the decree Julian, as Treasurer of the United

States, still had possession of certain described bonds in the aggregate amount of $457,500 and $106,657.96 in money—$16,000 of which were the proceeds of redeemed bonds and $90,657.96, interest. The court concluded as a matter of law that the bank had no power to pledge any of its assets to secure deposits of postal savings funds and that the pledge taken by the trustees was ultra vires and void, and contrary to the public policy of the State of Illinois. The court also held that the United States were not necessary and indispensable parties.

Assigned grounds for reversal are:

1. The bank had power to make the pledge, either because it was a member of the Federal Reserve System, or because the State, through the acquiescence of its banking officials, had confirmed the exercise of the power as a necessary incident of the banking business;

2. The United States are necessary and indispensable parties;

And other grounds which, in the view we take, need not be mentioned.

The Postal Savings System was established by Act of Congress of June 25, 1910, 36 Stat. 814, 39 U.S.C.A. §§ 751–769. By its provisions the Postmaster General, the Secretary of the Treasury, and the Attorney General were constituted trustees for control, supervision, and administration of the postal savings depository offices and the funds received there as deposits. The Act requires the trustees to make a comprehensive report to Congress at each session; gives the franking privilege for all pertinent mail; provides for deposits and issuance of pass books at post offices designated by the Postmaster General; provides for 2 percent interest (since reduced to the figure allowed by the Federal Reserve Board for time deposits); and provides for withdrawals by depositors.

39 U.S.C.A. § 759, authorizes deposit of savings funds in solvent state and national banks, and requires that, to insure prompt payment, the trustees take from such banks security in public bonds or other securities authorized by Act of Congress or supported by the taxing power, as the Board may approve. The same section further provides: "When, in the judgment of the President, the general welfare and interests of the United States so require, the board of trustees may invest all or any part of the postal savings funds, except the reserve fund of 5 per centum herein provided for, in bonds or other securities of the United States."

Section 760 permits depositors to purchase United States bonds by surrendering their deposits. Section 761 permits the trustees to notify the Secretary of the Treasury whenever they have funds for investment and in such case to invest in government bonds subject to call. Section 762 provides for keeping deposits separate from other postal funds and makes the bonds of postal employees and the statutes relating to the safekeeping of postal receipts applicable. Section 765 extends to savings funds all the safeguards provided for the protection of public moneys and all statutes relating to embezzlement. Section 766 pledges the faith of the United States to the payment of deposits with accrued interest.

Taken as a whole, the system constitutes a part of both the postal and fiscal operations of the government. Profits are treated as postal revenue, and the fund is held in reserve for emergency use of the government and to facilitate government refinancing operations by the purchase of government bonds. It is safeguarded as other public moneys, and the obligation to the depositors is the pledge of the United States.

When the case was submitted, we withheld decision pending appeals in the Supreme Court in the cases of Inland Waterways Corporation v. Hardee, and companion cases, 69 App.D.C. 268, 100 F.2d 678. Those cases involved *national* bank assets pledged to secure deposits made by agencies or corporations of the government, and it was thought the decisions there would be conclusive here. In all four cases, we had held on the authority of Texas & Pacific Ry. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777, and Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787, that the pledge was illegal. In both the latter, and also in Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794, the Supreme Court had said that a national bank had no power to make any pledge to secure deposits, except those specifically provided for by Acts of Congress. But in deciding the Waterways and the other cases,[1]—in none of which there was shown a specific Act permitting the pledge,—the Supreme Court held, as we read the opinion, that the long

---

[1] Inland Waterways Corp. v. Young, 60 S.Ct. 646, 84 L.Ed. ——, March 25, 1940.

continued practice of public officers in requiring pledges for federal funds, with the knowledge and acquiescence of the Comptroller of the Currency, was sufficient to create the power. In the light of this doctrine, we should have no trouble in declaring the pledge here valid, even in the absence of a federal statute authorizing it, if the bank involved were a national bank. But to apply the rule in the case of a state bank, where the Supreme Court of the State has held that its own banks are without power to make the pledge,[2] will be going a step further than we think is permissible even under the broad doctrine of the Waterways cases. For it is well established in Illinois that a corporation organized under its laws has only such powers as are expressly granted or as are necessarily implied from the specific grant, and likewise that the enumeration of granted powers implies exclusion of all others.[3] And we are admonished in the opinion in the Pottorff case—which we are told is still to be accepted as the law—that Congress cannot make valid a pledge by a state bank where the power is lacking under its charter or the laws of the state.[4]

█ Nor do we think we are much helped in this aspect of the question by the provisions of the Federal Reserve Act[5] authorizing membership of state banks. For the Act is careful to preserve the distinction between banks created by Congress and those created by state law. A review of the entire Act indicates that Congress, in providing for membership of state banks, confined itself to applying certain limitations and not to granting additional powers. See 12 U.S.C.A. §§ 321–338, 371–378. Section 330 provides that any bank becoming a member of the Federal Reserve System shall retain fully its charter and statutory rights as a state bank and may continue to exercise all corporate powers granted by the state in which it is created. When a state bank enters the Federal Reserve System, it becomes subject to certain restrictions and obtains certain privileges, but its powers are still derived from the state. Among others, it has the privilege of becoming a depository of public money; of being employed as a financial agent of the government; and of performing all reasonable duties as depository or financial agent.[6] But the committee reports and the debates in Congress on the amendment granting these privileges clearly indicate that it was not intended to confer new corporate powers. House Report 592, 70 Cong. 1st Sess.; Senate Report 961, id., 69 Cong.Rec. 3306, 7501. So that neither in the Federal Reserve Act nor in the Postal Savings Act is there anything which we can read as adding to or enlarging the corporate powers of state banks beyond those of the statute of their creation.

Some weight, it is quite true, may properly be given to the argument that a long continued practice, pursued with the knowledge of the Illinois Auditor of Public Accounts—an office which, we assume, corresponds with that of Comptroller of the Currency—established a usage which in itself created the power to pledge. This reasoning, as we have seen, was accepted in the Waterways cases. The difficulty here, if there is difficulty, is that the Illinois Court has decided the contrary of this.[7] And what, perhaps, is more to the point, the agreed facts fail to show how many—if any—other banks had been pledging assets for postal savings since 1911. The only evidence of a usage is that in 1937, five years after the bank's closing, 24 out of 500 solvent Illinois state banks had made pledges of the same nature. In these circumstances, we prefer to place our decision on what we regard as firmer ground, that is to say, on the ground that the deposit in this case was money of the United States, or at least money in which the United States have an interest, and the loss of which must be assumed and discharged by the United States, and that in consequence thereof the United States are indispensable parties.

Enough has been said of the facts to indicate that the deposit in appellee's bank at the time of its closing was a government fund placed there by its statutory custodians which they could withdraw and disburse only according to authority granted

2 People ex rel. Nelson v. Wiersema Bank, 361 Ill. 75, 197 N.E. 537, 101 A.L.R. 501.

3 See the Wiersema case, supra, 361 Ill. at page 87, 197 N.E. at page 542, 101 A.L.R. 501.

4 291 U.S. at page 257, note 11, 54 S. Ct. at page 416, 78 L.Ed. 777.

5 Act of Dec. 23, 1913, c. 6, sec. 9, 38 Stat. 259, 12 U.S.C. § 321 et seq., 12 U.S.C.A. § 321 et seq.

6 Act of May 7, 1928, c. 507, 45 Stat. 492, 12 U.S.C.A. § 332.

7 People ex rel. Nelson v. Wiersema Bank, 361 Ill. 75, 197 N.E. 537, 101 A.L.R. 501.

404

to them in the statutes. The pledge, too, was taken by authority of Congress, with the express purpose that the deposit should be secured against loss. If it consisted of "public moneys", there could be no question that the United States would be necessary parties to this suit. But even if it was not public moneys, strictly speaking, it certainly was, as the Supreme Court said as to the deposits in the Waterways cases, for all practical purposes money belonging to the United States. In this view, obviously the present suit is against the trustees and the Treasurer of the United States as custodians of a fund which they control under the mandate of Congress. It is not a suit against an individual, who happens to be an official, to recover property wrongfully taken by him under asserted government authority. It is rather a suit to control property which he holds by statutory authority and in which the United States have an interest and as to which he can act only within the limits of the law.

In this view, we think the case is much like Richmond, Fredericksburg & Potomac Railroad v. McCarl, 61 App.D.C. 290, 62 F. 2d 203. That case concerned the status of money under the recapture clause of the act of February 28, 1920.[8] The defense there was the right of the Comptroller General to set off an admitted debt of the United States to the carrier against this fund in the hands of the carrier. In discussing its status, we said that it was money which the carrier had collected and held as trustee for the United States and which the United States have a right to demand and receive as trustees under the provisions of the Transportation Act, and is, therefore, a fund properly due to the United States and subject wholly to such disbursement and control as Congress may declare.

■ The fund in the present case originated in the deposit with the United States by its owners of money, subject to withdrawal in all material respects as though it were deposited in a bank. When received, it was in due time deposited by the United States for safekeeping in a bank, and security was taken for its repayment, all in accordance with the congressional mandate. The statute, under which it was received by the United States, gave the President the right to invest all or any part of it when in his judgment the general welfare and public interest required. The credit of the United States was pledged for its repayment. This, at the very least, created as between depositor and government the relationship of debtor and creditor, and gave the United States full control of and full responsibility for its disposition. To say, in these circumstances, that a suit—the result of which will be to cut the fund in half—may be prosecuted without the United States as necessary parties, would be going too far. In exacting the pledge under which the bonds were delivered, appellants acted in accordance with the statute. If the pledge was illegal, it was nevertheless a pledge given to the United States to secure deposits of money for which the government was responsible. The acts of appellants were done in their official characters and not as individuals, and the suit is brought to make them exercise their official power over property held by them as officers, and in these respects the United States are indispensable parties.

This conclusion—in the light of the facts we have stated—seems to us to be necessary under the rule in Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599, and International Postal Supply Co. v. Bruce, 194 U.S. 601, 606, 24 S.Ct. 820, 821, 48 L. Ed. 1134. In the last named, an injunction was sought against a postmaster to prevent the use of certain machines which infringed the plaintiff's patent. In answering the certified question whether a federal court had jurisdiction to grant the injunction, the Supreme Court said: "In the case at bar the United States is not the owner of the machines, it is true, but it is a lessee in possession, for a term which has not expired. It has a property,—a right in rem,—in the machines, which, though less extensive than absolute ownership, has the same incident of a right to use them while it lasts. This right cannot be interfered with behind its back; and, as it cannot be made a party, this suit, like that of Belknap v. Schild [161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599], must fail. The answer to the question certified must be 'No.'"

And see also Oregon v. Hitchcock, 202 U. S. 60, 69, 26 S.Ct. 568, 50 L.Ed. 935; Naga-

[8] Sec. 15a of the Interstate Commerce Act, as amended in 1920, 41 Stat. 488, 49 U.S.C.A. § 15a, made it the duty of any carrier who received income in excess of a fair return to hold one-half part of the excess as trustee for the United States to create a reserve fund for loans to less successful carriers to meet expenditures for capital account, etc.

nab v. Hitchcock, 202 U.S. 473, 476, 26 S. Ct. 667, 50 L.Ed. 1113, and United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 221, 222, 34 S.Ct. 84, 58 L.Ed. 191.

We are, therefore, of opinion that we are without jurisdiction either to compel the Treasurer of the United States to surrender the bonds or to compel the trustees to make any payments out of moneys deposited in the Treasury of the United States earmarked as postal savings funds, which they control under the terms of the statute.

**Reversed.**