STITZEL–WELLER DISTILLERY v.
WICKARD, Secretary of Agricul-
ture, et al.

No. 7642.

United States Court of Appeals for the
District of Columbia.

Decided Feb. 3, 1941.

George R. Beneman and Norman J. Mor-
rison, both of Washington, D. C., for ap-
pellant.

Edward M. Curran, U. S. Atty., John
L. Laskey, Asst. U. S. Atty., John S. L.
Yost, Sp. Asst. to Atty. Gen., and Melva
M. Graney, all of Washington, D. C., for
appellees.

Before GRONER, Chief Justice, and
VINSON and EDGERTON, Associate
Justices.

GRONER, C. J.

This is a suit against the Secretary of Agriculture, the Secretary of the Treasury, and the Treasurer of the United States, officially and individually, to obtain the distribution of a fund in excess of a million dollars, now in the United States Treasury and earmarked—"Proceeds, distilled spirits industry, parity payments". The fund was accumulated under the following circumstances. In 1933 Congress passed the Agricultural Adjustment Act, 48 Stat. 31, in a declared effort to raise the prices of farm products and re-establish at the 1909–14 level their purchasing power with respect to the articles that farmers buy. The plan contemplated the reduction of the planted acreage of certain basic crops by agreement, the avoidance thereby of surplus production, and the payment to farmers of rentals and benefits based upon the acreage withdrawn from cultivation. The Act further authorized the Secretary of Agriculture to enter into marketing agreements with processors, and to issue licenses permitting them to engage in the handling of any agricultural commodity or product thereof, or any competing commodity, in the current of interstate or foreign commerce.[1]

When the Eighteenth Amendment was repealed a few months later, this Act created various problems for distillers. Whiskey is made more largely of corn than of any other grain, though rye, barley, and wheat are used in certain types. The use of corn and wheat subjected distillers to a processing tax under the Act which might be as great as the difference between the current average farm price and "the fair exchange value" of the commodity, which was defined as the price that will give the commodity the same purchasing power, with respect to the articles that farmers buy, as such commodity had in the pre-war period, August 1909–July 1914.[2] The use of rye and barley was not subject to the tax, nor was molasses, sugar

---

[1] "Sec. 8. In order to effectuate the declared policy, the Secretary of Agriculture shall have power—

\* \* \* \* \* \*

"(2) To enter into marketing agreements with processors, associations of producers, and others engaged in the handling, in the current of interstate or foreign commerce of any agricultural commodity or product thereof, after due notice and opportunity for hearing to interested parties. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: Provided, That no such agreement shall remain in force after the termination of this Act. For the purpose of carrying out any such agreement the parties thereto shall be eligible for loans from the Reconstruction Finance Corporation under section 5 of the Reconstruction Finance Corporation Act. Such loans shall not be in excess of such amounts as may be authorized by the agreements.

"(3) To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal economic conditions in the marketing of such commodities or products and the financing thereof. The Secretary of Agriculture may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the Secretary suspending or revoking any such license shall be final if in accordance with law. Any such person engaged in such handling without a license as required by the Secretary under this section shall be subject to a fine of not more than $1,000 for each day during which the violation continues." 48 Stat. 34, 35.

[2] "Sec. 9 \* \* \* (b) The processing tax shall be at such rate as equals the difference between the current average farm price for the commodity and the fair exchange value of the commodity; except that if the Secretary has reason to believe that the tax at such rate will cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the commodity or products thereof or in the depression of the farm price of the commodity, then he shall cause an appropriate investigation to be made and afford due notice and opportunity for hearing to interested parties. If thereupon the Secretary finds that such result will occur, then the processing tax shall be at

cane, or sugar beets, which could be used to make beverage alcohol for the manufacture of blended whiskey, gin, cordials, and liqueur. The cost of producing whiskey from beverage alcohol or molasses is less than from corn or rye, though the quality of the latter is superior. Presumably, therefore, distillers of grain whiskey had good reason, in order to avoid disorderly marketing conditions, to enter into a marketing agreement under the terms of the Act. In any case most, if not all, of the distillers did make such an agreement with the Secretary of Agriculture. They promised to use only cereal grains in the manufacture of distilled spirits, except under special permits to use other materials in limited amounts. They also agreed to pay the "fair exchange value" for all cereal grains used. Whenever the current average farm price, plus the unit processing tax, was less than the fair exchange value, they would pay the difference into the Treasury of the United States (or other depositary designated by the Secretary), to be "utilized for rental or benefit payments or other disbursements under the Act with respect to grain." The total amount of this "difference" between December 10, 1933, and April 18, 1934, when the agreement terminated, was in excess of a million dollars. The money was deposited in the United States Treasury, but was never used for the purpose intended. After certain provisions of the Agricultural Act were declared unconstitutional in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, the Comptroller General ruled that the money could not be so used, but should be kept in the Treasury. 15 Dec.Comp. Gen. 681. Subsequently Congress appropriated money to carry out the Secretary's agreements for payments to farmers who had complied with the provisions of the Act and regulations of the Secretary, and payments were made accordingly. 49 Stat. 1109, 1116, 1117.

Appellant is one of the contracting distillers and brought this suit on behalf of itself and all others similarly situated, to obtain the appointment of a receiver to take possession of the fund and distribute it to the contributors as their interests might appear. The District Court granted a motion to dismiss the complaint.

■ Appellant insists that the marketing agreement created a trust for the benefit of farmers complying with the Act, and the trust having failed, the Secretary as trustee should be required to return the money to the contributors, and that the United States are not necessary parties because the federal officers are acting solely as custodians of the fund. Appellant insists that the agreement exceeds the statutory authority of the Secretary of Agriculture as an officer of the United States, and on this premise argues that the Secretary must be considered as having acted in a private capacity and hence must be considered as trustee of a trust created by private parties entirely apart from governmental matters. The references in the agreement to the provisions of the Act are explained simply as the incorporation of statutory terms by reference into a private contract. We do not think the agreement can be explained in this manner. Article I states clearly that the parties "desire to enter into a marketing agreement *under the provisions of Section 8 (2) of the Act*" and therefore "agree as follows: * * *". This and other language of the agreement, taken in its ordinary sense, indicates that the distillers and the Secretary contemplated an agreement in accordance with a law enacted by Congress, and that the Secretary was to receive the money in his capacity as a government officer, not for the use of any particular parties but for use in a general purpose which the government had expressed in the Act, including administrative expenses. Furthermore, the agreement contained an application for

---

such rate as will prevent such accumulation of surplus stocks and depression of the farm price of the commodity. In computing the current average farm price in the case of wheat, premiums paid producers for protein content shall not be taken into account.

"(c) For the purposes of part 2 of this title, the fair exchange value of a commodity shall be the price therefor that will give the commodity the same purchasing power, with respect to articles farm-

ers buy, as such commodity had during the base period specified in section 2; and the current average farm price and the fair exchange value shall be ascertained by the Secretary of Agriculture from available statistics of the Department of Agriculture." 48 Stat. 36.

"Sec. 2 (1) * * * The base period in the case of all agricultural commodities except tobacco shall be the prewar period, August 1909–July 1914." 48 Stat. 32.

a license for the distilling industry, and the appellant correctly says this was an administrative or regulatory matter.

In our opinion this and the fact that the money sued for is now in the Treasury and that the United States have not consented to be sued, makes unnecessary any inquiry as to how it got there. In this view, we need not consider the validity of the marketing agreement or the authority of the Secretary to contract for and receive the payments. It is sufficient that the Secretary and the distillers voluntarily entered into the agreement under the provisions of the Act, and that the distillers received a license pursuant to its terms, whether or not the Act authorized it, of which they had the benefit during the period when the contract was in effect, and that the payment of the money was made, by the express declaration of the parties, under the provisions of the Act, and was deposited in the Treasury of the United States. We have many times decided that in such circumstances an Act of Congress is necessary for its withdrawal. Haskins Bros. v. Morgenthau, 66 App.D.C. 178, 85 F.2d 677, certiorari denied 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433; Cummings v. Hardee, 70 App.D.C. 18, 102 F.2d 622, certiorari denied Hardee v. Murphy, 307 U.S. 637, 59 S.Ct. 1033, 83 L.Ed. 1518; Farley v. Albers, 72 App.D.C. 136, 112 F.2d 401, certiorari denied 61 S. Ct. 37, 85 L.Ed. ——.

In the Haskins Bros. case we said [66 App.D.C. 178, 85 F.2d 681]:

"In the instant case it is therefore of no consequence whether the act under which the tax was collected be constitutional or unconstitutional. The fact that the tax has been collected and deposited in the treasury by the collecting officials of the government renders the custodian of the fund impotent to withdraw the money and disburse it unless and until directed to do so by an act of Congress or until the United States shall submit to be sued to determine its disposition.

"It is equally of no consequence that the bill alleges that the fund belongs to appellant and others similarly situated. It is not in the hands of the officers but in the treasury, and though earmarked as a special or trust fund, has been mingled with the moneys of the United States. The purpose of the bill, therefore, is to coerce the United States, through their officers to pay out money in the treasury as to which Congress has limited the power of withdrawal to the payment to the Philippine government. To permit this, would be to usurp the legislative function of appropriation, to substitute a court for the executive officers of the government, and to supplant by an order of court the duty and obligations imposed upon them by their oaths of office. It is therefore of no moment whether the United States have the use of this money as they do the ordinary revenues of the government or whether the money represents a trust fund created by Congress and earmarked for a specific purpose. In either case it is money in the Treasury of the United States as to which the United States had and have the power of control and disposition."

And there is nothing in Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478, to the contrary. In that case no interest of the United States was involved and the government officers themselves asserted that the United States had no proprietary interest in the fund. The officers held the money purely as stakeholders for transactions between determinable private parties, and not, as here, for the express purpose of using it for obligations which the government had undertaken.

This brings us to appellant's second point, which is that Congress has provided for the withdrawal of this money and its distribution to the distillers.

In 1934 Congress passed the Permanent Appropriation Repeal Act.[3] It was the result of certain rulings of the Comptroller General directing the deposit of money in checking accounts of officials into the Treasury in order that its disbursement should be subject to audit. The effect of the Comptroller's action was to permit the withdrawal of the moneys by the particular officers, after deposit in the Treasury, without express appropriation. Congress objected to the method but not the purpose, and the Committee Report accompanying H. R. 9410, 73d Cong., 2d Sess., recommended and Congress enacted that all moneys held by officers of the government by reason of their official capacity should be covered into the Treasury and that any subsequent disbursement be made only as the result of appropriation. Section 19

---

[3] 48 Stat. 1224, 31 U.S.C.A. § 725 et seq.

of the Act was intended to accomplish legally what Congress thought the ruling of the Comptroller General would have accomplished illegally, and was in this language: "That donations, quasi-public and unearned moneys carried in official checking accounts of disbursing officers and of others required to account to the Comptroller General (including clerks and marshals of the United States District Courts), administered by officers of the United States by virtue of their official capacity, shall be deposited similarly into the Treasury as trust funds and are hereby appropriated and made available for disbursement under the terms of the trust."

Section 20 contained a list of 91 such funds. The distillers' parity payment fund was not among those enumerated, but appellant explains that the Department of Agriculture had not catalogued its trust funds and therefore the Committee had no notice of them.

Appellant's position is that since the quoted provision directs disbursement of the fund according to the "terms of the trust", and since, as it thinks, the terms of the trust created by distillers' payments under the agreement include terms inferred as well as expressed, there was an implied direction that if the money paid in by distillers was not used as agreed, it was to be given back and that, the purpose having failed, there is no discretion left in the Secretary and he must refund the money. We think this does not follow. As we have already seen, the distillers and the Secretary entered into a contract reciting that its purpose was to correct conditions existing and likely to exist after the repeal of the Eighteenth Amendment in the marketing of domestic agricultural commodities ordinarily used in the distilled spirits industry, and to effectuate the declared policy of the Agricultural Act. To this end, the contracting distillers agreed to pay into the Treasury or such other depositary as should be designated by the Secretary the difference between the then market price of grain, plus the processing tax, and its fair exchange value, the amount so paid in to be utilized for rental or benefit payments to farmers or for other disbursements under the Act made with respect to grain. In other words, the

United States, having agreed with farmers, under Section 8 (1) of the Act, for the reduction in grain acreages and being under obligation to pay the agreed benefits and having appropriated one hundred million dollars in aid of that purpose, anticipated through the agreement with the distillers, through processing taxes, and the payment of the additional agreed amounts, to have on hand a fund sufficient for the payments to farmers as well as for other disbursements proper under the Act. After the Butler case was decided, the moneys received from processing taxes and the distillers' fund were presumably held in a state of suspense in the Treasury. Congress by a subsequent appropriation, 49 Stat. 1116, carried out the contracts with farmers, and by Act of June 3, 1937, 50 Stat. 246, 249, 7 U.S.C.A. § 672, ratified and confirmed all marketing agreements, licenses, orders, regulations, and provisions made by the Secretary under the Act.

The above facts show, then, that the distillers contracted to pay to the United States certain amounts of money and to receive from the United States a license authorizing them to engage in handling distilled spirits in interstate and foreign commerce. It is enough, we think, that the distillers voluntarily entered into the agreement, and received something from the United States which they considered then, if not now, a quid pro quo. In the circumstances, they certainly have no claim against the agent of the government through whom they contracted. Nor is their complaint framed on the theory of a wrongful act on his part. They seek no personal recovery from him. Instead, they claim under the contract in asking that he exercise powers which they say are conferred upon him by the Permanent Appropriation Repeal Act to withdraw the money from the Treasury. We are of opinion that the Act does not confer this authority, for there is certainly nothing in Section 19 of the Act which can be said specifically to declare the purpose of Congress to appropriate the sum in issue here for repayment to the distillers; and without such "specific" appropriation, there can be no withdrawal of the money.[4] Nor is it any clearer that repayment to the distillers is a "term of the trust". It is

---

[4] Act of June 30, 1906, section 9: "No Act of Congress hereafter passed shall be construed to make an appropriation out of the Treasury of the United States * * * unless such Act shall in specific terms declare an appropriation to be made * * *." 34 Stat. 764, 31 U.S.C.A. § 627.

quite true that there is a general doctrine of equity that where a trust fails, the trustee will be compelled to return the money or property to the creator of the trust. Hopkins v. Grimshaw, 165 U.S. 342, 17 S.Ct. 401, 41 L.Ed. 739; Restatement of Trusts, Sec. 411. And appellant cites cases in which the rule has been treated as one of implied intention. Be that as it may, we do not think that Congress intended an appropriation to be made in this roundabout manner, namely that the money in this so-called "trust fund" was to be paid to the distillers in the face of an express provision in the marketing agreement that it was to be used for other purposes. We need not and do not express any opinion whether Section 19 even includes this fund or provides for its disposition in any particular manner. We hold only that it does not appropriate it for the refund to appellant and others in the same position.

While the case has been pending in this court, Henry A. Wallace has been succeeded in the office of Secretary of Agriculture by Claude R. Wickard. The name of the latter was substituted as a party, in his official capacity, without objection. Some doubt was expressed at the oral argument, however, on the propriety of the substitution insofar as the suit was originally filed against Wallace as an individual. Since in our opinion Henry A. Wallace was acting only in his official capacity in receiving this fund and depositing it in the Treasury, and the case is controlled by this point, we need not pass on the question thus raised. The complaint states no cause of action against either Wallace or Wickard as individuals.

Aside from the matters we have discussed, appellant's real position in this controversy is that it is inequitable and unfair for the government to use for general expenses a fund which the contracting distillers contributed in good faith to carry out a particular program which has since been declared unconstitutional and inoperative. This may well be true, but in seeking judicial enforcement of whatever equities may exist, appellant is met by a more important constitutional rule that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law". Const. art. 1, § 9, cl. 7. Relief must, therefore, be sought from Congress before the courts may act.

Affirmed.