UNITED STATES v. OHIO OIL CO.

No. 3412.

Circuit Court of Appeals, Tenth Circuit.

Sept. 10, 1947.

Rehearing Denied Oct. 22, 1947.

T. Blake Kennedy, Judge.

Marvin J. Sonosky, Atty., Department of Justice, of Washington, D. C. (David L. Bazelon, Asst. Atty. Gen., Francis B. Critchlow, Sp. Asst. to Atty. Gen., and Walter H. Williams, Atty., Department of Justice, of Washington, D.C., on the brief), for appellant.

Harold D. Roberts, of Denver, Colo. (Robert E. More, of Denver, Colo., A. M. Gee and Hal W. Stewart, both of Findlay, Ohio, and W. Hume Everett, of Casper, Wyo., on the brief), for appellee.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Acting under asserted authority of an administrative regulation, as embodied in departmental oil and gas leases, the Secretary of the Interior determined the minimum value for which he would accept payment for royalty oil produced from such leases in the Lance Creek Oil Field in Wyoming, and threatened to institute appropriate proceedings to cancel the leases unless the lessees paid the minimum price fixed and determined by him. The Ohio Oil Company, as one of the lessees, finally paid the difference between 77¢ per barrel, the price for which it sold the royalty oil to the pipeline, and $1.02 exacted by the Secretary, on the condition that the difference be deposited by the Secretary in a trust fund pending judicial determination of the power of the Secretary to determine the minimum value of the royalty oil. This is a test suit brought under the Tucker Act, 28 U.S.C.A. § 41(20), to recover $9,186.96 paid by the Ohio under protest in accordance with the agreement with the Secretary to refund the same if it be judicially determined that the Secretary had no power under the lease agreement to fix and determine the minimum value for the royalty oil.

The pleadings raised the questions: (1) the jurisdiction of the court over the subject matter under the Tucker Act; (2) whether the Secretary of the Interior was authorized to fix and determine the minimum value for which he would accept payment for the royalty oil under the lease in question; and (3) if so, whether the Secretary acted arbitrarily in the exercise of

that authority. The trial court sustained its jurisdiction under the Tucker Act, and held that "the Secretary had no legal right to fix a minimum price for its royalty oil and require the lessee to pay that price or submit to a forfeiture of its leasehold rights"; and that his actions were "unlawful, inequitable, arbitrary and unreasonable" [65 F.Supp. 991, 996]. The same questions are presented on appeal.

The Tucker Act, under which this suit was brought, confers jurisdiction on the District court "of all claims * * * founded upon the Constitution of the United States or any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort." The leases in question were originally granted by the Secretary of the Interior under authority of the Mineral Leasing Act of February 25, 1920, 41 Stat. 437, 30 U.S.C.A. § 181 et seq., for a period of twenty years, to expire in 1940, and were extended in 1937 under the authority of amendatory Acts of 1931 (Pub.No. 853, 46 Stat. 1523) and 1935 (49 Stat. 674). The original leases specifically incorporated the 1920 Act, and the extension agreements incorporated the amendatory enabling acts and the applicable regulations of the Department of the Interior in effect December 1, 1936. It is under the authority of these administrative regulations that the Secretary has asserted the power to fix and determine the minimum value of the royalty oil.

The Government does not deny that the claim in suit arises under a law, regulation or contract, but jurisdiction of the court is challenged on the premise that a claim against the United States is "founded upon" a law, regulation or contract only when the law, regulation or contract relied upon by the claimant creates in him the right to the money claimed, and imposes upon the Government the correlative obligation to pay; that there is nothing in the statute, regulations or contract involved here which creates the right to the money claimed or imposes any obligation upon the Government to pay. The authorities cited in sup-

636

port of this proposition do involve laws of Congress which create the right and impose an obligation to pay the adjudicated claim. See United States v. Hvoslef, 237 U.S. 1, 10, 35 S.Ct. 459, 59 L.Ed. 813, Ann.Cas.1916 A, 286; McLean v. United States, 226 U.S. 374, 33 S.Ct. 122, 57 L.Ed. 260; Medbury v. United States, 173 U.S. 492, 19 S.Ct. 503, 43 L.Ed. 779; See also United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825; Christie-Street Commission Co. v. United States, 8 Cir., 136 F. 326. But they do not announce the rule contended for by the Government. Indeed, the suggested distinction between the jurisdictional phrases "arising under" and "founded upon" has been expressly rejected as resting "on the inadmissible premise that the great act of justice embodied in the jurisdiction of the Court of Claims [Tucker Act] is to be construed strictly and read with an adverse eye." See United States v. Emery, Bird, Thayer Realty Co., supra, citing with approval Christie-Street Commission Co. v. United States, supra [136 F. 331], which announced the rule that "A claim is both founded upon, and it arises under, a provision of a Constitution or of a law which conditions and determines its validity."

■ We agree, however, that an obligation to pay is an essential ingredient of the court's jurisdiction under the Tucker Act. Indeed, such an obligation is a concomitant of the sovereign's consent to be sued. But we cannot agree that the requisite obligation to pay must necessarily rest in the law, regulation or contract which gives rise to the asserted claim. We think it sufficient for jurisdictional purposes if the validity of a claim is determined by a law, regulation or contract, and there does exist an express obligation to pay the adjudicated claim.

When a dispute arose between the Secretary as lessor and the Ohio as lessee concerning the power and authority of the Secretary under the contract to fix and determine the minimum value of the royalty oil, the disputants entered into a solemn agreement under which the Ohio delivered to the Secretary the amount in controversy, on the condition that it would be deposited in the treasury of the United States in a trust-fund receipt account entitled "unearned moneys, lands (Interior Department) available for refund" as authorized by Section 19 of the Permanent Appropriations Repeal Act, 48 Stat. 1232, 31 U.S.C.A. § 725r. It was agreed that the money should be held in this account "pending a final judicial determination as to the authority of the Secretary of the Interior to require the payment of the money as royalty due under the lease. Should it be finally determined judicially that such authority is not vested in the Secretary, the money held in the trust-fund account, or so much thereof as you may be entitled to receive, will be repaid to your Company." Section 19 of the Permanent Appropriations Act of June 26, 1934, supra, provides in material part that unearned moneys of the Department of the Interior held in official checking accounts of disbursing officers shall be deposited in the treasury of the United States to appropriately designated trust-fund receipt accounts and shall be available for refunds, and for transfer of the earned portions thereof into an appropriate receipt fund titles on the books of the Government.

■ There can be no doubt of the authority of the Secretary under this Act to accept the conditional payment in accordance with the agreement, and to hold it for refund if it be judicially determined that he had no authority to exact it. Cf. Stitzel-Weller Distillery v. Wickard, 73 App.D.C. 220, 118 F.2d 19. We think this legally binding agreement provides an amply sufficient obligation to pay the adjudicated claim. But there is another equally satisfactory obligation imposed upon the Secretary by Section 96, Title 43 U.S.C.A. 41 Stat. 366, as amended by Section 98a, Title 43 U.S.C.A. 46 Stat. 822. This statute provides in material part that "In all cases where it shall appear to the satisfaction of the Secretary of the Interior that any person has made any payments to the United States under the public land laws in excess of the amount he was lawfully required to pay under such laws, such excess shall be repaid to such person or to his legal representatives."

■ But the Government says that this obligation is contingent upon a favorable

finding by the Secretary, and that there has been no such finding here. After hearing, the Secretary ruled, as a matter of law, that the lease contract gave him authority to determine the reasonable value of the royalty oil, and has acted in pursuance of that asserted authority. This order is final and no other administrative remedies are available. It is admitted that the order is not "free from all judicial review", and we do not suppose that the jurisdiction of the court depends upon whether, under the Secretary's interpretation of the law, the claimant is entitled to the refund, or whether on judicial review his judgment would be sustained. United States v. Laughlin, 249 U.S. 440, 39 S.Ct. 340, 63 L.Ed. 696. We think it correct to say that Section 96, supra, imposes an obligation to pay the claim if it be finally determined that the Secretary had no legal authority to exact the funds.

The gravamen of this suit is the construction of the lease contract and its constituent laws and administrative regulations. If it be construed as contended by the Secretary, the trust funds have been earned and may be transferred to an appropriate receipt fund title on the books of the Government. If, however, the contract be construed to deny the asserted power of the Secretary, the Ohio has been required to make payments to the United States under the public land laws in excess of the amount it is lawfully required to pay under such laws, and the Secretary is obligated by law to repay the Ohio the excess payments.

■ It is also contended that the funds in suit were tortiously exacted by the Secretary, hence a claim therefor sounds in tort from which the sovereign is traditionally immune in the absence of specific enabling legislation. In support of this contention, the Government cites and relies upon United States v. Holland-America Line, 254 U.S. 148, 41 S.Ct. 72, 74, 65 L.Ed. 193. That case held that "the claim presented sounded in tort, and was in substance an action to recover for the wrongful acts of the United States officials in compelling the claimant to pay under duress and without authority of law the sum sued for." The court's decision is based upon Basso v. United States, 239 U.S. 602, 36 S.Ct. 226, 60 L.Ed. 462 and Schillinger v. United States, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108, which drew a clear distinction between claims ex delicto and those ex contractu, and announce the rule that the Tucker Act does not confer jurisdiction upon the Court of Claims or the district court in actions sounding in tort for unauthorized wrongs inflicted upon citizens by government officers while engaged in the discharge of official duties.

But this claim is not ex delicto. It arises under a lease contract as the embodiment of a law of Congress and the regulation of an executive department, and the result depends upon the judicial construction of that contract. If it be judicially determined that the Secretary had no legal authority under the law and regulation to require the Secretary to pay the funds, he is under a legally binding obligation to repay it. It follows that the claim in suit is founded upon a law, an executive regulation, and an express contract, jurisdiction over which is conferred by the Tucker Act.

■ Assuming that the court has jurisdiction under the Tucker Act, it is urged that the $9,186.96 was voluntarily paid to the Secretary, and the Ohio cannot therefore recover it. In other words, there is no cognizable controversy between the parties. The argument seems to be that the Ohio was not required to pay the funds, but could have awaited the threatened suit to cancel the lease, and there interposed as a defense the issues which form the basis for this suit.

No doubt the Ohio could have pleaded its construction of the lease contract as a valid defense to a suit for cancellation. See Bell Oil & Gas Co. v. Wilbur, 60 App.D.C., 256, 50 F.2d 1070. But the remedy thus afforded is in no wise exclusive of the remedy asserted here. The action to enjoin the Secretary of the Interior from instituting proceedings to cancel oil leases in the Bell case failed because the plaintiff had an adequate remedy at law. The availability of the remedy suggested by the Government certainly does not preclude the Ohio from paying the funds under protest and bringing suit to recover on the theory that they were exacted under a misconstruction of the contract between the parties.

The fact that the funds were paid under protest does not lessen the coercive effect of the demands, nor change the nature of the lawsuit. The Ohio was put to the choice of defying the asserted authority of the Secretary and awaiting the institution of a threatened suit to cancel, or to follow the more amicable course of making a payment under protest upon the condition that it would be repaid if not owing. It is laudable for the Government, acting in its proprietary capacity, to agree with its contracting citizens to submit their differences for judicial determination. Such conduct should be encouraged and not viewed with a critical eye. We conclude that the payment of the funds by Ohio would not, in the circumstances, preclude it from maintaining this suit to recover.

The original Mineral Leasing Act of 1920, which authorized the granting of mineral leases on the public domain, also blueprinted their terms and conditions. Section 19, 30 U.S.C.A. § 228, under which this lease was granted, specifically provided that certain qualified persons shall be "entitled to a lease * * * under such terms as the Secretary of the Interior may prescribe * * * provided * * * the royalty to be fixed * * * shall be not less than 12½ per centum of all of the oil or gas produced * * *." Generally, the Act provided that each lease should contain provisions authorizing the Secretary to prescribe rules for the prevention of undue waste, hours of employment, ages of employees, freedom of purchase, the payment of wages at least twice a month, and "such other provisions as he may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare: * * *" (Section 30, 30 U.S.C.A. § 187).

In addition thereto, the Secretary was authorized "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this Act, also to fix and determine the boundary lines of any structure, or oil or gas field. * * *" Section 32, 30 U.S.C.A. § 189.

The original lease involved here was for a period of twenty years with a preferential right of renewal upon such reasonable terms and conditions as may be prescribed by the Secretary. It provided for the payment of a graduated percentage of the oil produced from the lease of not less than 12½ per centum, based upon the daily average production. It separately provided for the payment of "12½ per centum of the value of the gas in the field, where the average production per day for the calendar month is less than 3,000,000 cubic feet, and 16⅔ per centum where the average daily production is 3,000,000 cubic ft. or over." It provided for the payment of "16⅔ per centum of the value of the casing-head gasoline extracted from the gas produced and sold, computed on the basis provided for in the operating regulations." The lease also significantly provided that the value of gas and casing-head gasoline where produced, unless disposed of under an approved sales contract or other provided method, "shall be as fixed by the Secretary of the Interior." The lease did not, however, provide for the payment of a percentage of the value of the oil produced as it did of the gas and casing-head gasoline, nor did it provide that the value of the oil should be fixed by the Secretary as it did gas and casing-head gasoline. Thus, neither the original Act, nor the lease contract executed in pursuance thereof, purports to authorize the Secretary to fix and determine the minimum value of the royalty oil. On the contrary, the legislative history of the Act indicates a deliberate purpose to withhold such power from the Secretary. See Congressional Record Vol. 58, p. 4733-4735, 66th Congress, 2d Session.

But, the original lease expired by its terms in 1940, and the Ohio had no further mineral rights in the land, unless the lease was renewed upon reasonable terms and conditions prescribed by the Secretary, or unless otherwise provided by law at the time of its expiration. It is the Government's position that the extension lease contract expressly incorporated valid and subsisting regulations of the Secretary authorizing him to fix and determine the reasonable minimum price for which it would accept payment for the royalty oil it elect-

ed to take in money; that such regulations were authorized and the Secretary has acted within the scope of the authority thus conferred upon him.

The Amendatory Act of 1931, supra, in material part, authorized the owners of departmental oil and gas leases in an oil and gas area, field or pool, to enter into a unitization agreement, with the consent and approval of the Secretary, for the development and operation of all the wells in the area, field or pool for the purpose of conserving the natural resources in the public interest. It provided that any lease becoming the subject of a cooperative or unit plan of operation "shall continue in force beyond the period of twenty years until the termination of such plan." And the Secretary was authorized in his discretion, with the consent of the holder of the leases involved, to establish, alter, change or revoke royalty requirements of the leases, and to make such regulations with reference to them, with the consent of the lessees, in the institution and operation of the cooperative unit plan as he may deem necessary to secure the proper protection of the public interest.

The 1935 Amendment, supra, specifically authorized the Secretary inter alia to issue new leases to lessees holding oil and gas leases under any provisions of the Act at the time the Amendment became effective, such new leases to be in lieu of the leases then held by the lessees, and to be "at a royalty of not less than 12½ per centum [in amount] or value of the production, to be determined by the Secretary of the Interior by general rule * * *."

In pursuance of these amendatory Acts, and after more prolific production in deeper horizons, the lessees in the Lance 'Creek area, with the consent and approval of the Secretary, entered into a cooperative plan on November 10, 1937. This plan embraced the oil and gas lease in question, and operated to renew and extend it under the terms and conditions of the unit plan. The agreement recited the issuance of the original leases under the original Act and the purposes of the amendatory enabling Acts. It specifically incorporated the provisions of the original Act insofar as applicable, and further provided that "all development and operation under this agreement shall be subject to the operating regulations approved by the Secretary of the Interior under act of Congress of February 25, 1920, as amended, and in effect on December 1, 1936, to the extent that such regulations are not inconsistent with the specific terms of the leases or of this agreement, particularly in the matter of rates of royalty and rental * * *." It provided that royalty of the United States should be computed and paid in accordance with the rules and regulations approved by the Secretary of the Interior, and upon his demand should be paid in kind; that all existing leases included within the unitization plan were modified and changed to conform to the provisions thereof, and as thus modified, would remain in effect for a term of five years from the date of the agreement, and so long thereafter as oil and gas were produced in paying quantities.

Section 3(e) of the Oil and Gas Operating Regulations, in effect December 1, 1936, referred to in the extension agreement, and relied upon by the Secretary as authority to determine the reasonable minimum value of the royalty oil, provides that: "The value of production, for the purpose of computing royalty, in the discretion of the Secretary * * * may be calculated on the highest price per barrel, paid or offered * * * at the time of production in a fair and open market for the major portion of like quality oil * * * produced and sold from the field where the leased lands are situated; but under no conditions shall the value of any of said substances for the purpose of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than such reasonable minimum price as shall be determined by said Secretary."

█ We agree with the appellee that in all of his transactions with the lessee, the Secretary acted for and on behalf of the Government in a proprietary capacity, and that his contractual powers were measured by the basic enabling Act and the amendments thereto. He was specifically authorized to contract on behalf of the Government with its citizens, and in so doing, he was fulfilling the constitutional power of Congress to dispose of, and make all need-

ful regulations respecting, the territory of the United States. Art. 4, Sec. 3, Clause 2 of the Constitution. His powers were not strictly ministerial. He was charged with safeguarding the public interest, and was thus authorized not only to execute a naked lease contract, but was also originally authorized to prescribe necessary and proper rules and regulations to accomplish the purposes of the Act as amended.

We have no doubt of the power of the Secretary, acting in the public interest, to require as a condition to his approval of the unitization and extension agreement, that all development and operation thereunder should be subject to operating regulations which were in effect when the agreement was made, and of which the lessees undoubtedly had full knowledge when they executed the extension agreement. It was not improper, we think, to specifically agree that the royalty oil accruing to the United States under the lease, as renewed, should be computed and paid in accordance with the rules and regulations approved by the Secretary, and to further agree that all existing rules and regulations with respect thereto should be altered, changed, or modified to conform to the new agreement between the parties. This being so, it is not for the courts to say that the Secretary was not authorized by law to do that which the parties agreed he might, simply because we can find no specific legislative authorization therefor.

If, therefore, the parties have agreed that under no conditions shall the value of the production for purposes of computing royalty be deemed to be less than such reasonable minimum price as shall be determined by the Secretary, we cannot say that the power thus conferred upon him by the parties to the contract is in excess of his statutory power, or unauthorized in law. The parties were free to contract with respect to the subject matter, and there is nothing in their agreement which we can say is at variance with the enabling legislation or repugnant to public policy. It is consistent and in accord with the Congressional mandate that every lease shall contain a provision authorizing the Secretary to provide rules and regulations for the protection of the United States, for the prevention of monopoly and for safeguarding the public welfare. In our opinion Regulation 3(e) was valid and subsisting when the parties executed the extension agreement; that it entered into and became a part of the contract, and by its terms authorized the Secretary to determine the reasonable minimum value of the royalty oil.

But the Ohio contends that the Secretary may not demand "value of production" or fix the value of the royalty oil, without first offering it for sale at public bidding in a manner prescribed by Section 36 of the original Act, 30 U.S.C.A. § 192. This, the Ohio says, is a statutory condition precedent to any exercise of authority with respect to determining the value of the royalty oil.

Section 36 of the original Act, applicable to all leases executed thereunder, provides in substance that all royalty accruing to the United States under any lease should, on demand of the Secretary, be paid in oil or gas. And further, that except whenever in his judgment it is desirable to retain the royalty oil for the use of the United States, the Secretary shall offer for sale all royalty oil and gas on sealed public bids or at public auction.

We think the plain implication of the language used authorized the Secretary to take the royalty oil in kind or in money; that he was required to offer for sale at public bidding or auction only the oil he elected to take in kind; and that the conditions imposed by Section 36 did not have application to oil which he elected to take in money. This construction of the statute is fortified by the provision in the original lease contract with reference to sales contracts, wherein the lessee agreed to file with the Secretary copies of all sales contracts for the disposition of the oil and gas produced under the lease, "and in the event the United States shall elect to take its royalties in money instead of oil or gas, not to sell or otherwise dispose of the products of the land leased except in accordance with a sales contract or other method first approved by the Secretary of the Interior."

But, be that as it may, the 1935 Amendment, under which the extension agreement was executed, and under which

the oil involved here was produced, provided for a "royalty rate of not less than 12½ per centum in amount or value of the production." Accordingly, the extension lease agreement provided that royalty to the United States should be computed and paid in accordance with rules of the Secretary of the Interior, and upon his demand should be paid in kind. We think it plain therefore that the Secretary was authorized to demand value of production for the royalty oil, and that he was not required to offer the same for sale at public bidding as a condition to the determination of the reasonable value for which he would accept payment.

It is also insisted that the contract price at which the oil was sold was in fact the reasonable minimum price, and the Secretary therefore exceeded any authority he may have had, in determining the reasonable value to be in excess thereof. In that connection, it is suggested that the oil in question was sold to the pipeline company for a uniform price of 77¢ per barrel under a purchase contract between the producer and the pipeline company, of which the Secretary had knowledge. It is said that the contract was fairly and openly entered into with the Secretary's knowledge and consent; that the producers were obligated to and did sell and deliver approximately sixteen million barrels of oil thereunder, and the Government is estopped to deny that it does not represent the reasonable minimum value of the oil.

 On the question of estoppel, it is sufficient to say that the purchase contracts were submitted to and approved by the Secretary, with the express understanding that his approval should not be construed as an admission by the United States that the prices to be paid for the crude oil under the agreement, insofar as it applied to the Government royalty oil, "are reasonable or representative of its fair value, or acceptable to the United States." It is thus plain that aside from the traditional inapplicability of the doctrine of estoppel against the United States, (see Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; United States v. San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L.Ed. 1050) the Secretary is not estopped to determine the reasonable minimum value of the royalty oil.

 This leaves only the question whether the Secretary exercised his prerogative capriciously and arbitrarily in fixing the minimum value of the royalty oil at $1.02 per barrel; that is, whether he exceeded the authority granted to him under the contract. See Gillioz v. Webb, 5 Cir., 99 F.2d 585, and cases cited therein. The trial court did not base its finding of arbitrariness on the record adduced before the Secretary, but conducted an independent hearing for the purpose of determining for itself the reasonable value of the oil in question. We do not think the trial court was at liberty to disregard or ignore the factual basis upon which the Secretary proceeded, nor was it at liberty to substitute its concept of value for that of the Secretary. We should remember that the contract authorized the Secretary, not the court, to determine the reasonable minimum value of the royalty oil. We are not favored with the data or facts on which the Secretary based his determination of value, but his order does recite that it is based upon the findings and recommendations of the geological survey having supervision of the lands in question. After the original order fixing the minimum price and the date on which it was to become effective, a rehearing was granted before the Assistant Secretary of the Interior, at which all parties were afforded an opportunity to present evidence touching the value of the oil, after which the original order was modified, and as modified, determined the reasonable minimum value of the oil to be $1.02 per barrel.

The record before us shows that oil of inferior grade and quality, produced in the same country, and transported to the same markets under similar conditions as the Lance Creek oil, sold at $1.02 per barrel. There is nothing to indicate a justification for the 25¢ per barrel differential, except that the purchase contract was entered into for the purpose of inducing the purchaser to construct a pipeline to the Lance Creek area in order to afford a market. We have no doubt of the bona fides of the contract, but the courts are not empowered to usurp a prerogative especially committed to the Secretary under the contract.

The Secretary's order denying rehearing and finally fixing the minimum value of the royalty oil recited that "full and careful consideration" had been given to the report of the geological. survey, to the memorandum of the petitioners, and to the evidence offered in the proceedings; that particular consideration had been given to: "(1) Its general characteristics, the elements that determine its intrinsic value, and its value for refining purposes as compared with competitive crude oils; (2) the competitive market situation; (3) the transportation costs and facilities; (4) the posted prices for Lance Creek and competitive crude oils, and (5) the existing contracts for the sale of Lance Creek crude oil that have been conditionally approved by the Department."

From the record before us, we are convinced that the Secretary's determination of reasonable minimum value of the royalty oil is not unlawful, inequitable, arbitrary and unreasonable, and the cause is accordingly Reversed.