# UNITED STATES v. NEW YORK DOCK CO., Inc., et al.

United States District Court
S. D. New York.

Aug. 2, 1951.

Irving H. Saypol, U. S. Atty. for Southern District of New York, New York City, for plaintiff (Edward L. Smith, William H. Lane, New York City, Advocates).

Davies, Hardy, Schenck & Soons, New York City, for defendant New York Dock Co. (Kenneth W. Greenawalt, John H. Barber, New York City, of counsel).

Kirlin Campbell & Keating, New York City, for defendant Atlantic Piers Co. (Michael F. Whalen, Alexander E. Rugani, New York City, of counsel).

LEIBELL, District Judge.

The defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. to dismiss all three causes of action alleged in a complaint of plaintiff on the grounds (1) that the United States of America is not the proper party plaintiff and (2) that all three claims are barred by the New York State statute of limitations.

The pertinent underlying facts are as follows: In late August or early September 1944 the United States Commercial Company, a wholly owned subsidiary of the Reconstruction Finance Corporation, which in turn is wholly owned by the United States of America, acquired a shipment of raw untanned hides by purchasing the bills of lading therefor while the shipment was enroute to New York aboard the S. S. Fernglen, a vessel operated by the Norwegian Government through its agent, Barber Lines, Inc. This shipment was sold by the United States Commercial Company to certain private corporations, and as part of the contract of sale United States Commercial Company agreed to take out insurance which would cover any damage to the hides until they were received in the private purchaser's actual custody. The United States Commercial Company did not in fact procure the insurance but instead assumed the risks for its own account.

Upon delivery to the purchasers, some of the hides were found to be seriously damaged by contact with water and other foreign substances. Part of the shipment was undelivered, because it was short. As a result, the United States Commercial Company was required to pay and did in fact pay to the purchasers the amount of the damage and loss. The total amount thus paid was $6,643.45.

Previous suits were brought on these claims by the United States Commercial Company in the names of private parties, the various purchasers, who were represented in those actions by the United States Attorney for this District. Schmoll Fils, Inc., v. The Fernglen, her engines, etc., D.C., 85 F.Supp. 578. Both actions were dismissed on jurisdictional grounds, and the motion of the United States Commercial Company to intervene as the real party in interest was denied, because this Court had no jurisdiction when the actions were instituted and jurisdiction could not be conferred by intervention. The complaint in the present action was later filed. October 26, 1950.

Defendant, New York Dock Company, Inc. was the lessee of Pier 38, Brooklyn, New York, at which the ship carrying the cargo docked. Defendant Atlantic Piers Company, Inc. was a sub-tenant, or otherwise operated Pier 38.

In its complaint and as part of its *first cause of action* plaintiff alleges:

"5. Plaintiff sues on behalf of United States Commercial Company and its successor in interest, the Reconstruction Finance Corporation, as well as upon its own behalf.

\*　　\*　　\*　　\*　　\*　　\*

"8. On or about September 5, 1944, the shipments hereinabove described were badly damaged as a result of the failure of defendants to receive and store and care for said shipments properly, and as a result of their failure to furnish the said

shipments with necessary and proper protection from loss and damage and due to other wilful, wanton and negligent acts of defendants, which will be proved at the trial, all in violation of the obligations and duties of defendants as dock lessee or operator, terminal operator and warehousemen.

"9. As a result of defendants' negligence plaintiff was required to pay and did in fact pay to the purchasers of the said cargo by way of deductions from full contract purchase price the amounts listed below pursuant to the terms and conditions of the sales contracts described in Article 6 hereinabove as follows representing claims for damage and shortage: (thereafter are set forth the individual contracts and the amounts paid on each, totalling $6,643.45).

"10. As a result of defendants' negligence plaintiff has been damaged to the extent of $6,643.45, no part of which has been paid although duly demanded."

For a *second cause of action* plaintiff realleges all the allegations of the first cause of action and further alleges that Øivind Lorentzen, as Acting Director and Curator of the Norwegian Shipping and Trade Mission, acting through its agent, Barber Lines, Inc. arranged a contract for benefit of plaintiff with the defendants, under the terms of which the defendants agreed to care for, store, preserve and protect the aforementioned shipments; that defendants failed to carry out the terms of this contract, as a result of which the cargo was damaged.

For a *third cause of action* plaintiff realleges the allegations of the first cause of action and further alleges that the S. S. Fernglen was operated by Øivind Lorentzen, Acting Director and Curator of the Norwegian Shipping and Trade Mission, with Barber Lines as its agent; that they had arranged for pier space at Pier 38; that Lorentzen did not deliver the goods in good order but in a seriously damaged and short condition, and that Lorentzen and the Barber Lines had contracted with defendants whereby the latter had agreed to act as terminal operators, warehousemen and bailees of the cargo. It is also alleged that under the terms of a waiver of claims

agreement between plaintiff and the Royal Norwegian Government, which allegedly covers the loss involved herein, plaintiff acquired whatever rights the Norwegian Shipping and Trade Mission, Barber Lines and the Royal Norwegian Government had against the defendants on the facts pleaded, and plaintiff is now claiming those rights in this suit.

In their affidavits on this motion the attorneys for defendant, New York Dock Company, Inc., state that "any rights of action in respect of such claims (if there be any) is in the United States Commercial Company and that that company would be barred under statutes of limitations because of failure to have brought suit either within three years or within six years from Sep-5, 1944". Sections 49(6) and 48(1) of the N.Y.Civil Practice Act.

■ The real party in interest in this litigation in the first and second causes of action is the United States. The United States Commercial Company is a wholly owned corporate subsidiary of the Reconstruction Finance Corporation, which is a wholly owned corporate agency of the United States, both of them operating with government funds. Defense Supplies Corp. v. United States Lines Co., 2 Cir., 148 F.2d 311; Inland Waterways Corp. v. Young, 309 U.S. 517, at page 524, 60 S.Ct. 646, 84 L.Ed. 901. The United States may properly sue on the two claims in the first and second causes of action, as the real party in interest under Rule 17(a) Fed. Rules of Civ.Proc. But for the purpose of deciding whether the New York State statute of limitations is a defense to the first and second causes of action, the claims should be considered as those of the United States Commercial Company.

■ As to the third cause of action, the United States is the real party in interest as well as the nominal plaintiff. The claim therein asserted is one acquired by the United States under an agreement which it made with the Royal Norwegian Government, which the complaint alleges (par. 20) "covers the loss as against the ocean carrier, the S. S. Fernglen, the Norwegian Shipping and Trade Mission, her operator and the Barber Lines, Inc.,

the vessel's agent." The agreement is printed in 1946 A.M.C. at pages 534–537, and is discussed in Petition of Panama Transport Co., 2 Cir., 172 F.2d 351. The agreement was made May 29, 1945, about eights months after the claims herein arose. The claims were not barred by the New York statute of limitations at the time the United States acquired them from the Norwegian government, and the New York statute of limitations could not bar them after their acquisition by the United States. A different situation was presented in Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224, but the principle involved was the same. In that case the claims were barred by the New York State statute of limitations before they were assigned to the United States by Russia under the Litvinof agreement.

Under the agreement of May 29, 1945 the United States claims to have acquired whatever rights its transferor (the Norwegian government) had; and what those rights were will be determined at the trial of this action. The motion for summary judgment as to the third cause of action is denied.

The claims set forth in the first and second causes of action, one for a tort (negligence) and the other on a contract, alleged to have been made for the benefit of the plaintiff (i. e. for the United States Commercial Company) by the Norwegian Shipping and Trade Mission acting through its agent Barber Lines, Inc., present a more complicated problem, but its analysis will show that the motions in respect to those two causes of action must also be denied.

The Charter of the United States Commercial Company is printed in the Code of Federal Regulations, Cumulative Supplement, Title 13 at page 3818. The following quoted provisions of the Charter have a direct bearing on the legal questions raised by this motion in respect to the first and second causes of action.

"Third. . The objects, purposes and powers of the Company shall be:

"(a) To produce, acquire, carry, sell, or otherwise deal in strategic and critical materials as defined by the President;

\* \* \* \* \* \*

"(g) To take such other action as the President and the Secretary of Commerce may deem necessary to expedite the national defense program;"

\* \* \* \* \* \*

"Fourth. The company including its franchise, its capital, reserves, surplus, and income shall be exempt from all taxation (which shall, for all purposes, be deemed to include sales, use, storage, and purchase taxes) now or hereafter imposed by the United States, or any territory, dependency or possession thereof, or by any State, County, municipality or local taxing authority, except that any real property (or buildings which are considered by the laws of any State to be personal property for taxation purposes) of the company shall be subject to State, territorial, county, municipal or local taxation to the same extent according to its value as other real property is taxed.

"Fifth. [The United States Commercial Company as an] instrumentality of the United States Government, shall be entitled to the free use of the United States mails, and shall in all other respects be possessed of the privileges and immunities that are conferred upon the Reconstruction Finance Corporation under the Reconstruction Finance Corporation Act, as amended [15 U.S.C.A. § 601 et seq.]."

A reading of the entire charter shows that the creation of this corporation was a war measure to enable the government to enter the field of strategic and critical materials and by production, purchases and sales to control that field in the interest of the national defense program. Evidently leather was one of the critical materials, and that accounts for the purchase and sale of the hides involved in this litigation.

The United States Commercial Company was created during the war, March 26, 1942, as one of the govermental instrumentalities in the conduct of World War II. Having served its purpose, its

liquidation (by the R.F.C.) was ordered under a joint resolution of Congress on June 30, 1947. This corporation was not intended to enter the fields of business in times of peace and engage in business speculations. To make war is a constitutional function of the government. Article 1, § 8, cl. 11. It pertains to the preservation of its status as a sovereign. Hence the operations which the government conducted through the United States Commercial Company were the exercise of a purely governmental function. The following quotation from an opinion of Judge Andrews in United States v. Brown, 247 N.Y. 211, 160 N.E. 13, 15, in which he described the status of the United States Shipping Board during World War I, seems applicable. "Whether, and, if so, how and when, our national government may put aside its sovereignty and engage in commercial ventures we do not discuss. Nor whether, if it may do so, without its express consent, its rights, remedies, and liabilities under its business contracts are measured by the same rules that govern private persons. There is no indication of such a theory when it is sued on policies of war risk insurance (Standard Oil Co. v. United States, 267 U.S. 76, 45 S. Ct. 211, 69 L.Ed. 519) nor where it operates merchant vessels (Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472). At least under this act, however, the Shipping Board was not engaged in ordinary commercial activities. It might build, purchase, or charter vessels. Their title would be in the United States. It might contract on behalf of the state with individuals to operate them. Such contracts failing, it might create a corporation for the same purpose. It is idle to say that Congress by this act committed the government to a mere business speculation. In view of threatened danger, resorting to the broad war powers confided to it, to guard the national safety and vital national interests, it made provision for ships required for military and naval purposes, or, should the need arise, to transport our troops, to feed our people, to continue our commerce. It was purely a war measure with no thought of profit. Berizzi Brothers Co. v. S. S. Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed 1088." The New York Court of Appeals, headed by Judge Cardozo, was unanimous in reaching the conclusion that the government rights were not affected by the N.Y. statute of limitations.[1]

The Reconstruction Finance Corporation has had thousands of business transactions, in practically every branch of industry in its almost twenty years of existence. It has a number of subsidiary corporations. The reason for the extensive rise in the use of corporate instrumentalities by the government in recent years, is explained by Mr. Justice Frankfurter in Keifer & Keifer v. R. F. C., 306 U.S. 381 at page 390, 59 S.Ct. 516, 518, 83 L.Ed 784, as follows: "Because of the advantages enjoyed by the corporate device compared with conventional executive agencies, the exigencies of war and the enlarged scope of government in economic affairs have greatly extended the use of independent corporate facilities for governmental ends. In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included. Such a firm practice is partly an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope."

In that case the high court held that Regional Agricultural Credit Corporation of Sioux City, chartered by the R.F.C. pursuant to Congressional authorization, was amenable to suit, although at the time there was no express statutory provision to that effect. As Mr. Justice Frankfurter stated in that case, 306 U.S. at page 389, 59 S.Ct. at page 528: "Congress may, of course, endow a governmental corporation with the government's immunity. But always the question is: has it done so?"

---

1. The members of the Court were: Cardozo, Pound, Crane, Andrews, Lehman, Kellogg and O'Brien.

In the case at bar there is no question of the power of United States Commercial Company to sue or of the right of a claimant to sue it; its charter [Paragraph Third, sub-section (h)] so provides. The question here is this: "Although expressly empowered to sue and be sued, does the United States Commercial Company retain sovereign immunity from the application of a State statute of limitations, when there is nothing in its charter or in the legislation creating and endowing the Reconstruction Finance Corporation with various powers, specifically granting such immunity?"

 If the claims in suit are claims to which the United States became entitled, "acting in its governmental capacity", and if it "asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement." United States v. Summerlin, 310 U.S. 414, at page 417, 60 S.Ct. 1019, at page 1020, 84 L.Ed. 1283. In the Summerlin case the claim was acquired by the United States through an operation under The National Housing Act and the court held that that fact did not take the case out of the rule "that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights" and "The same rule applies whether the United States brings its suit in its own courts or in a state court."

██ True, the tendency of recent decisions is to limit the sovereign immunity claims of corporate agencies through which the government has engaged in numerous business enterprises, but there are no decisions of the federal appellate courts that those corporations are not immune from the defense of a state statute of limitations.

In United States v. Edgerton & Sons, Inc., 2 Cir., 178 F.2d 763, 764, Judge Swan remarked: "When the United States conducts business transactions through a corporation, the tendency of recent decisions is to hold that such corporation does not possess sovereign immunity unless expressly endowed with it." In the Edgerton case, the court held that a quantity of powdered eggs owned by the Commodity Credit Corporation was subject to a warehouseman's lien. The corporation (created pursuant to Executive Order and chartered as a Delaware corporation) was expressly granted immunity from federal and state taxation, by congressional enactment, but the Court held that it "possessed no other immunity". The opinion held that that could be so implied from the limited immunity expressly conferred by Congress. The corporation in the case at bar possessed a similar immunity from taxation except real estate taxes.

But in the Edgerton case, the transaction took place in September 1947, two years after the cessation of hostilities. Further, the Commodity Credit Corporation was created in 1933, pursuant to Executive Order 6340, dated October 16, 1933, and was part of the Recovery Program. Its charter gave it broad powers, such as are usually possessed by private corporations. The Second Circuit accordingly held that it had the power to store the powdered eggs involved in the suit, and that if it did so they became subject to a warehouseman's lien. In the Edgerton case the purposes for which the corporation was created were essentially commercial and were not to aid in the exercise of a purely governmental function such as the successful conduct of a war.

In R. F. C. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595, the court held that since the Congress had expressly given the R.F.C. the power to sue and be sued, the R.F.C. was subject to costs the same as any other litigant, as an ordinary incident of litigation. But that is not very persuasive as an argument for holding that the R.F.C., or one of its subsidiaries, is subject to a state statute of limitation.

In Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 490, 84 L.Ed. 724, it was held that under an authorization to the Administration to sue and be used in any court of competent jurisdiction, State or Federal, the F.H.A. was subject to a garnishee under the State

law for moneys due to an employee. In discussing the tendency of judicial decisions to liberally construe waivers by Congress as to governmental instrumentalities, Mr. Justice Douglas stated that we should start with the premise that such waivers "should be liberally construed". He added: "This policy is in line with the current disfavor of the doctrine of governmental immunity from suit, as evidenced by the increasing tendency of Congress to waive the immunity where federal governmental corporations are concerned. Keifer & Keifer v. Reconstruction Finance Corp., supra. Hence, when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued', it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense. In the absence of such showing, it must be presumed that when Congress launched a a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be."

However, a liberal construction of the charter grant of a right to sue and be sued, would not require a court to deny the governmental corporation immunity from a state statute of limitation.

The attention of the Court has been called to the case of Reconstruction Finance Corporation v. Marcum, decided on January 25, 1951, D.C.W.D.Mo., 100 F.Supp. 953. There the court held that "state statutes of limitation putting a time limit upon enforcement of obligations due private persons are not binding on the Reconstruction Finance Corporation any more than they are binding upon the Government unless Congress has manifested an intention that they should be applicable", citing United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 and E. I. Du Pont de Nemours & Co. v. Davis, 264 U.S. 456, 44 S.Ct. 364, 68 L.Ed. 788.

There is some language in Board of Com'rs of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 288, 84 L.Ed. 313, which seems to indicate that it would require an express declaration of Congress to deprive a governmental agency of immunity from a state statute of limitations. In that case, which involved a claim by the government for taxes and interest thereon, illegally collected on lands of an Indian by the County of Jackson, State of Kansas, Mr. Justice Frankfurter stated: "Again, state notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise. United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539. Cf. Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889. This is so because the immunity of the sovereign from these defenses is historic. Unless expressly waived, it is implied in all federal enactments."

In another case, Reconstruction Finance Corporation v. Haag, decided by Judge Ackerson in the New Jersey Supreme Court, Hudson County (unreported), it was held that the Reconstruction Finance Corporation was not subject to the statute of limitations of New Jersey. This opinion in this case has not been printed, but a photostat of the opinion was submitted by the plaintiff. It appears to be a very thorough and intelligent discussion of the question of the immunity of a governmental agency from the defense of a state statute of limitations.

In the case of Reconstruction Finance Corp. v. Foster Wheeler Corp., D.C., 70 F. Supp. 420, decided by District Judge Kennerly, it was held that the R.F.C. was subject to the State of Texas Statute of Limitation of two years. Defendants lean heavily on that case. It does not appear to have

been appealed or cited thereafter. The Defense Plant Corporation (a subsidiary of the R.F.C.) had made a contract with the defendant, Foster Wheeler Corporation, for the construction of a cooling tower for a butadiene plant, at Houston, Texas. The complaint charged that, within two months after the cooling tower was erected, it failed to function because of faulty workmanship, design and material. It seems to me that the Defense Plant Corporation was exercising a governmental function in building a plant to make artificial rubber during the war and that the District Court should have held the claim not barred by the Texas statute of limitations.

The case of United States v. Harp, D.C. Okl., 80 F.Supp. 236, affirmed 10 Cir., 173 F.2d 761, certiorari denied 338 U.S. 816, 70 S.Ct. 56, 94 L.Ed. 494, held that a state statute of limitations did not apply to a suit by the United States under the Walsh-Healey Act, 41 U.S.C.A. § 35 et seq., to recover liquidated damages from a contractor for violation of the Act by employing females under 18 years of age in the manufacture of goods for the United States. This was clearly the enforcement of a statute designed to assist in the performance of a governmental function in relation to government contracts and since Congress did not expressly consent to the application of a state statute of limitations to such a suit, no such consent could be imported into the Walsh-Healy Act from the Portal-to-Portal Act, 29 U.S.C.A. § 216 et seq. But in United States v. Craddock-Terry Shoe Corporation, 84 F.Supp. 842, a similar suit, the District Court in Virginia found against the government on the merits, and also held that the action, brought under the Walsh-Healey Act, was subject to the state statute of limitation by reason of certain provisions of the Portal-to-Portal Act. On appeal, the Fourth Circuit affirmed the decision on the merits, but stated that it had "no occasion to pass upon the additional defense considered by the District Court that the suit was barred by limitations". 178 F.2d 760, at page 762.

The action in the case at bar could have been instituted in the name of the United States Commercial Company, as to the first and second causes of action. However, it was properly brought in the name of the United States, on behalf of that company. The summons and complaint may be amended by adding the United States Commercial Company as a party plaintiff and by alleging that that company is the claimant in the first and second causes of action, if the government wishes to do so. For reasons stated above, the United States of America is undoubtedly the only proper plaintiff for the third cause of action. The statute of limitations of the State of New York is not a defense to the first and second causes of action, even if they were alleged in the name of the United States Commercial Company, and, of course, it is no defense to the third cause of action.

The motions of the defendants for a summary judgment dismissing the causes of action alleged in the complaint are in all respects denied.